ZIMMERMAN, John G., on behalf of himself and all others similarly situated

v.

HBO AFFILIATE GROUP, ACS Enterprises, Inc., Hometheatre, Inc., Video Consultants, Inc., Home Box Office, Inc., Conley and Wanning, Inc., Conley, Raymond W., and Wanning, Matthew.

Appeal of John G. ZIMMERMAN.

No. 87–1241.

United States Court of Appeals, Third Circuit.

Argued Sept. 28, 1987.

Decided Dec. 9, 1987.

Rehearing and Rehearing In Banc Denied Jan. 6, 1988.

William B. Lytton, III (argued), Harold E. Kohn, Robert J. LaRocca, Victor P. Barall, Kohn, Savett, Klein & Graf, P.C., Arline Jolles Lotman, Law Offices of Arline Jolles Lotman, Philadelphia, Pa., for appellant.

Howard D. Scher (argued), Patrick T. Ryan, Andrew N. Rothseid, Montgomery McCracken, Walker & Rhoads, Philadel-phia, Pa., for appellees, HBO Affiliate Group, ACS Enterprises, Inc., Home Theatre, Inc. & Video Consultants, Inc.

Robert D. Joffe (argued), Cravath, Swaine & Moore, New York City, John G. Harkins, Barbara W. Mather, Pepper, Hamilton & Scheetz, Philadelphia, Pa., Marc J. Apfelbaum, Rosemary Q. Barry, Cravath, Swaine & Moore, New York City, of counsel; for appellee, Home Box Office, Inc.

Before: GIBBONS, Chief Judge, and MANSMANN and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

The principal question presented in this case is whether the defendant cable television companies, in demanding monetary compensation in settlement of asserted legal claims against persons whom the defendants accused of having illegally received microwave television signals, were seeking to collect a "debt" within the meaning of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et. seq. (Supp. II 1978) ("FDCPA"). We also consider whether the allegation, that a letter which threatened legal action in the event of non-payment was extortionate in nature, states a claim of injury to the plaintiff's "business or property" under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. §§ 1961–1968 ("RICO"). Finally, we must determine whether the plaintiffs are entitled to a declaration that The Federal Communications Act is not violated by mere possession of an antenna capable of unauthorized reception of HBO's programming.

The district court dismissed the complaint for lack of a substantial federal claim, and we will affirm.

### I.

In reviewing a motion to dismiss under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, we accept the facts of the complaint as true and charac-

terize the facts most favorably to the plaintiff as follows. Defendants Home Theatre, Inc., ACS Enterprises and Video Consultants, Inc. (the "Affiliates") have franchise agreements with defendant Home Box Office, Inc. ("HBO") authorizing them to distribute HBO's video programming service to individual subscribers in the Philadelphia area. The video programming is transmitted by means of microwave signal which is received through specially tuned antennae and converter equipment. Subscribers pay a monthly fee for the service. However, anyone having a proper antenna and converter can receive the programming without paying for it.

In early 1985, the Affiliates undertook a campaign to prevent signal "piracy" in their service area. During February and March of 1985, the Affiliates published in Philadelphia area newspapers various advertisements which showed a picture of a police van and stated: "If you are illegally receiving HBO, soon this will be the only free ride for HBO thieves." The publications also stated that illegal reception of HBO signals carries a penalty of up to a $50,000 fine and two years in prison, and stated in bold face type: "To Avoid Prosecution, Call Before March 15, 1985."

During March and April of 1985, the Affiliates contacted Conley and Wanning, Inc. ("C & W") to discuss the possibility of conducting an anti-theft campaign in the Philadelphia area similar to those previously conducted elsewhere by C & W. On October 24, 1985 the Affiliates formed the HBO Affiliate Group (the "Affiliate Group") for the purpose of funding and carrying out the anti-theft campaign. The Affiliate Group immediately entered into an agreement with C & W, under which C & W was to develop and effectuate the campaign subject to the supervision of the Affiliate Group.

The complaint further alleges that HBO was informed of the Affiliates' plan to conduct the campaign, was aware of C & W's method of operation and chose not to restrict the activities of the Affiliates or monitor the campaign.

The Affiliate Group and C & W then undertook to identify unauthorized users of the HBO signal. The effort involved visual inspection of the exterior of homes in the Philadelphia area and the collection of photographs of homes to which were affixed "unauthorized" antennae apparently capable of receiving the HBO signal. In some instances, electronic devices were employed to determine whether these antennae were in fact being used to receive the signal at the time of observation. From that survey, the defendants compiled a list of names and addresses of persons suspected of receiving HBO programming without a subscription.

On or about January 10, 1986 plaintiff Zimmerman and other members of the putative class received in the mail a letter which the plaintiff alleges was drafted by C & W, approved by the Affiliate Group and signed by their counsel. The plaintiff also alleges that the franchise agreements contained language impliedly giving the Affiliates the right to use the name HBO in sending the letter.[1] On or through the envelope were visible the following statements: "Open Immediately—Pending Legal Action," and "Violation of Federal Law." The letter read as follows:

> In recent weeks, areas of Philadelphia have been subjected to a photographic and electronic survey in a search for violators of *Section 705 of the Federal Communications Act of 1984.*

> Be advised that the above-mentioned property is listed as maintaining an unauthorized microwave antenna which is

---

1. These agreements contain the following language:

   Affiliate shall not permit, and shall take all necessary, appropriate and reasonable precautions to prevent, the reception of all or any part of the HBO service by any party who is not an HBO subscriber paying the full applicable Supplementary Service Charge
   . . . .

   \* \* \* \* \* \*
   Affiliate ... will ensure that the HBO Service will be received only by HBO subscribers who pay the Supplementary Service Charge....
   \* \* \* \* \* \*
   Affiliate shall cause the HBO logo to be conspicuously displayed at its office and on its advertisements and other promotional material.

tuned to and receiving the private, home entertainment programming of Home Box Office (HBO).

After repeated warnings over the past few years, this illegal reception can no longer be tolerated in the Philadelphia area.

This violation is punishable by civil damages of up to $10,000. The companies I represent, known as the HBO Affiliate Group, have the exclusive right to authorize reception of the HBO signal. Consequently, they have instructed me to file suit in U.S. Federal District Court on January 27, 1986, seeking maximum damages against those who fail to comply in full with the terms of this letter. Your name is currently on the list of potential defendants in this action. In order to be eliminated from this litigation, the following *three* steps must take place on or before *January 24, 1986:*

1. IMMEDIATELY remove the unauthorized equipment.

2. Sign the enclosed agreement to stop your illegal reception of the HBO signal.

3. Return this agreement with your check or money order for $300 made payable to the HBO AFFILIATE GROUP no later than January 24, 1986. A return envelope is enclosed for this purpose. This amount is considered to be an out of court settlement of all prior and present claims against you. THIS SETTLEMENT OFFER IS NOT NEGOTIABLE.

You will also find enclosed the most recent Public Notice from the Federal Communications Commission regarding this matter. Read this enclosure carefully in order to settle any questions you may have about the unauthorized reception of HBO's MDS signal in the Philadelphia area.

We repeat, this is your only opportunity to settle this matter for the amount stated. Following the initiation of Federal Court litigation on January 27, 1986, the out of court settlement will be dramatically increased.

Approximately 5,600 persons received the letter although only 200–300 homes had actually been electronically monitored and, of those monitored, approximately ⅓ had produced no reading or data of any kind. The remaining recipients of the letter were selected due to the presence on their homes of antennae assertedly capable of receiving the HBO signal. Plaintiff Zimmerman has no antenna on his roof. Wires from an antenna on his neighbor's roof run into Zimmerman's house but are not connected to anything. Other members of the putative class do not have an antenna of any kind or have a "ham radio" antenna for which they are licensed.

The defendants collected approximately $150,000 from recipients of the letter.

## II.

The plaintiff filed this action on January 24, 1986, seeking damages as well as injunctive relief and requesting certification of a class of all persons who received the defendant's letter of January 10, 1986. The complaint charged the defendants with violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"); and the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C.A. §§ 1961–1968 ("RICO"). The district court had jurisdiction under 28 U.S.C. § 1331 to review the complaint. The complaint also included pendant state claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–1 *et seq.* and regulations promulgated thereunder, and additional counts charging common law fraud, intentional infliction of emotional distress and invasion of privacy.

The district court granted the plaintiff's motions for a temporary restraining order and later for a preliminary injunction restraining the defendants from filing individual lawsuits as threatened in the letter and ordering the money already collected by the defendants to be held in escrow pending further order of the court.

In March of 1986, the plaintiff filed an amended complaint with an added count requesting a declaration that the defendants had improperly construed the Federal

Communications Act, 47 U.S.C. § 605, to make mere possession of a particular type of antenna a violation of the Act for which the plaintiff and members of the class might be held criminally or civilly liable.

The plaintiff moved for partial summary judgment on Counts I and II, the claims under the Fair Debt Collection Practices Act and the Pennsylvania Unfair Trade Practices and Consumer Protection Law. During March, April and May of 1986, the defendants moved for dismissal of the amended complaint pursuant to Fed.R.Civ. P. 12(b)(1) and 12(b)(6) for failure to state a claim upon which relief may be granted and for lack of subject matter jurisdiction. The defendants also moved to stay consideration of the plaintiff's motion for class certification.

On April 15, 1987, the district court entered an order dismissing the amended complaint with prejudice, dismissing as moot the motions for class certification and for stay of consideration, and dissolving the preliminary injunction. The plaintiff appealed.

We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. On a motion to dismiss the complaint for failure to state a claim, under Fed.Civ.P. 12(b)(6), all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party. *Wisniewski v. Johns–Manville Corp.*, 759 F.2d 271, 273 (3d Cir.1985). Our review of the district court's application of this legal standard is plenary.

The plaintiff claims that the district court's dismissal of Count I resulted from misinterpretation of the Fair Debt Collection Practices Act, that the dismissal of Counts III, IV, V and VI was not based on the facts as alleged in the complaint, that the district court erred in denying the claim for declaratory relief under the Federal Communications Act, that the court misinterpreted the state statute and regulations, and that the district court erred in dismissing the plaintiff's motion for class certification. We will examine each of the appellant's claims in turn.

III.

A. *The Fair Debt Collection Practices Act*

■ Count I of the complaint alleged a violation of the Fair Debt Collection Practices Act ("FDCPA") which provides a remedy for consumers who have been subjected to abusive, deceptive, and unfair debt collection practices by debt collectors. 15 U.S.C. § 1692. Consumers who are aggrieved by such practices may recover damages and attorney's fees and costs. 15 U.S.C. § 1692k(a). Among the practices prohibited is the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. A threshold requirement for application of the FDCPA is that the prohibited practices are used in an attempt to collect a "debt".

The complaint alleged that the defendants' letter of January 10, 1986 contained numerous false or misleading representations made in connection with the defendants' attempt to collect the $300 payment which the plaintiff argues was a "debt" within the meaning of the FDCPA. The district court found that the defendants' demand for $300 represented a settlement offer for potential tort liability and was not a "debt" within the meaning of the FDCPA. The language of the statute, its legislative history and its interpretation by this court all support the district court's dismissal of this count.

As defined in the FDCPA, "[t]he term 'debt' means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5). "Transaction is a word of flexible meaning." *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610, 46 S.Ct. 367, 371, 70 L.Ed. 750 (1926), and the statute does not define the nature of the "transaction(s)" which may give rise to a "debt."

The plaintiff argues that the statute protects consumers against abusive attempts to enforce an alleged obligation to pay money arising out of a transaction which may be either tortious or consensual in nature. The defendant argues that the statute is directed toward protecting legitimate contractual—or at least consensual—exchanges in which a consumer has allegedly obtained money, property or services by undertaking to pay for them.

In *Staub v. Harris*, 626 F.2d 275 (3d Cir.1980), we held that a per capita tax levied by local taxing authorities does not fall within the statutory definition of the word debt. We found it unnecessary to decide whether a statutory "debt" must always result from a formal contract. Judge Sloviter, writing for the court, stated:

> We believe that, at a minimum, the statute contemplates that the debt has arisen as a result of the rendition of a service or purchase of property or other item of value. The relationship between taxpayer and taxing authority does not encompass that type of *pro tanto* exchange which the statutory definition envisages.

626 F.2d at 278.

The plaintiff argues that if the FDCPA is interpreted to apply only to contractual debts, a "deadbeat" who has a subscription for HBO service but does not pay for it is protected under the Act, while collectors may use abusive tactics to extract money from innocent persons who have not contracted for the service. The plaintiff also asserts that an offending collector could avoid the strictures of the Act simply by artfully characterizing the "debt" as arising from a tortious transaction. The plaintiff argues that Congress could not have intended such a result.

As to the plaintiff's first argument, the legislative history indicates clearly that it is exactly such a person, *i.e.*, one who has contracted for goods or services and is unable to pay for them, that Congress intended to protect. Congress' presumption in enacting the FDCPA was that the vast majority of those who would enjoy the protection of the Act would not be "dead-beats". Congress found that in most cases consumers undertake these obligations fully intending to repay them. The legislative history attests to Congress' recognition of universal agreement among scholars, law enforcement officials and debt collectors alike that the number of persons who willfully refuse to pay just debts is miniscule, and that when default occurs, it is nearly always due to an unforseen event such as unemployment, overextension, serious illness or marital difficulties or divorce. S.Rep. No. 382, 95th Cong., 1st Sess. 3, *reprinted in* 1977 U.S.Code Cong. & Admin.News 1695, 1697.

Congress' principal reason for enacting the FDCPA was to prevent abuses against these consumers by third party debt collectors who, unlike creditors, are unrestrained by the desire to protect their good will when collecting past due accounts. The statute does not even attempt to restrain all who might be in a position to engage in the egregious practices with respect to collection of a debt. There are numerous exceptions to the definition of "debt collector." Nothing in the statute or its legislative history leads us to attribute to Congress a purpose to protect against a perceived problem with the use of abusive practices in collecting tort settlements from alleged tortfeasors through threats of legal action.

The FDCPA was enacted as an amendment to the Consumer Credit Protection Act, 15 U.S.C. § 1601 *et seq.* While the concept of a "transaction" is broader than that of a contract and may describe negotiations which have been only partly brought to a conclusion, nothing in the statute or the legislative history leads us to believe that Congress intended to equate asserted tort liability with asserted consumer debt.

We find that the type of transaction which may give rise to a "debt" as defined in the FDCPA, is the same type of transaction as is dealt with in all other subchapters of the Consumer Credit Protection Act, *i.e.*, one involving the offer or extension of credit to a consumer. Specifically it is a transaction in which a consumer is offered or extended the right to acquire

"money, property, insurance, or services" which are "primarily for household purposes" and to defer payment.

The plaintiff's arguments can be interpreted as a claim that once a harassing, deceptive or unfair collection attempt is instigated, a defendant is estopped to claim that the asserted obligation is not a "debt." However, an essential element of an estoppel is a change in the respective positions of the parties. There is no named plaintiff who claims to have paid any money or otherwise changed his position in reliance on the defendant's characterization of the asserted obligation in connection with its collection efforts.[2] Consequently, an estoppel cannot lie. We need not proceed to analyze whether the defendants might have characterized the asserted obligation in such a manner as to bring it within the statutory definition of a "debt."

No offer or extension of credit is asserted in the complaint or in the defendants' letter of January 10, 1986. Therefore we find that the complaint fails to state a claim under the FDCPA. Insofar as the defendants may have overreached in their accusations and efforts to collect money in settlement of their claims, the plaintiff's remedy is elsewhere than under the FDCPA. We will affirm the district court's dismissal of this count.

B. *The Racketeer Influenced and Corrupt Organizations Act*

■ Count III of the complaint alleged that the defendants, by attempting to extort money by fraudulent pretenses from the plaintiff and members of the putative class, were engaging in a "pattern of racketeering activity" in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. §§ 1961–1968 ("RICO"). The district court found that, even if the defendants had accused and demanded satisfaction from persons who were not receiving HBO programming illegally, their actions did not rise to the level of criminal or quasi-criminal conduct necessary to support a RICO charge. We agree that the complaint fails to state a cause of action under RICO, but our decision is based on a somewhat different ground. We need not consider the more complex question of whether the plaintiff has met his burden to allege satisfactorily racketeering activity under § 1962. We find that the plaintiff has failed to carry his pleading burden under § 1964(c).

A plaintiff seeking recovery under RICO must allege injury "in his business or property" caused by violation of the Act. 18 U.S.C.A. § 1964. In *Reuter v. Sonotone*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), the Supreme Court construed identical language from the Clayton Act on which the RICO statute was patterned. The Court concluded that Congress intended the phrase "business or property" to exclude personal injuries. *Id.* at 339, 99 S.Ct. at 2331.

The named plaintiff has alleged only injury in the nature of mental distress, not an injury "in his business or property." Therefore he has no cause of action on a RICO claim nor could he meet the requirement of Fed.R.Civ.P. 23 that his claim be "typical" of that which he seeks to assert on behalf of the putative class. It is well settled that to be a class representative on a particular claim, the plaintiff must himself have a cause of action on that claim. *See, e.g., Haas v. Pittsburgh National Bank*, 526 F.2d 1083 (3d Cir.1975); *Bailey v. Patterson*, 369 U.S. 31, 32–33, 82 S.Ct. 549, 550–51, 7 L.Ed.2d 512 (1962).

The plaintiff insisted at oral argument that, had the class been certified, class members who had paid money might have been located and persuaded to come forward as representatives. The plaintiff argues that the district court erred in dismissing the motion for certification as mooted by dismissal of the complaint instead of considering the merits of class certification.

Decisions regarding certification of a class are within the sound discretion of the

**2.** Our later discussion herein, of the issue of class certification in connection with the RICO

claim, applies here with equal force.

**1170**

district court, *Eisenberg v. Gagnon,* 766 F.2d 770, 784 (3d Cir.1985), and we find no abuse of discretion here.

■ The claims of the representative party must be typical of the claims of the class. Fed.R.Civ.P. 23(a). Adequacy of representation must be established before an action may proceed on behalf of a class. *Id.* Therefore we find no abuse of discretion in the district court's refusal to consider certification of a class before determining whether the named plaintiff, and *a fortiori* any putative class which the named plaintiff might properly seek to represent, had a federal cause of action.

No named plaintiff claims to have paid money to the defendants as a result of the allegedly "extortionate" letter. Accordingly we will affirm the district court's dismissal of that claim.

### C. *The Federal Communications Act*

Count VII of the complaint sought declaratory relief under the Federal Communications Act ("FCA"), 47 U.S.C. § 605. The plaintiff interpreted the defendants' letter of January 10, 1986 as asserting that merely having an "unauthorized" antenna capable of receiving HBO programming is a violation of the defendants' rights under the FCA. The plaintiff claims that the defendant threatened him and members of the putative class with legal action based on this interpretation of the FCA, and asserts entitlement to a declaration that the interpretation is erroneous.

The district court declined to render a declaratory judgment on the FCA claim, relying on Professor Borchard's "general rule" that the declaration is an instrument of practical relief and will not be issued where it does not serve a useful purpose. *See* E. Borchard, Declaratory Judgments 307 (2d ed. 1941). The district court found the absence of a genuine dispute since no party to the litigation had ever asserted that it was unlawful merely to own an antenna capable of unauthorized reception of microwave signals.

The Declaratory Judgments Act provides that a court *"may"* declare the rights and other legal relations of any interested party seeking such declaration...." 28 U.S.C. § 2201 (emphasis added). The decision to grant or withhold a declaratory judgment is committed to the discretion of the district court, and that decision will not be reversed in the absence of an abuse of discretion. *Exxon Corp. v. F.T.C.,* 588 F.2d 895 (3d Cir.1978).

■ Before a federal court may grant a declaratory judgment, there must be a live dispute between the parties. *Cutaiar v. Marshall,* 590 F.2d 523 (3d Cir.1979). There must be a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant issuance of a declaratory judgment. The fundamental test is whether the plaintiff seeks merely advice or whether a real question of conflicting legal interests is presented for judicial determination.

■ Although the threat of legal action may present a real controversy, *see Simmonds Aerocessories v. Elastic Stop Nut Corp.,* 257 F.2d 485 (3d Cir.1958), the remedy of a declaratory judgment is discretionary even where a justiciable controversy exists. *Bituminous Coal Operators' Ass'n. Inc. v. International Union, United Mine Workers of America,* 585 F.2d 586 (3d Cir.1978).

■ The defendants' letter is reasonably susceptible of the interpretation given by the district court, namely that the defendants were threatening to sue only those who were "receiving" the HBO signal. Thus it is purely a matter of conjecture whether the defendants have threatened to file suit on the theory on which the plaintiff has requested a declaration. the dispute lacks the immediacy and reality necessary to require a judicial declaration of rights as between the parties.

Based on the record before us, we hold that the district court did not abuse its discretion in determining that there was no actual controversy between the parties of sufficient immediacy to require judicial interpretation of the FCA as it affects the legal relations between the plaintiff and the defendant.

## IV.

All of the federal claims were properly dismissed. Absent a substantial federal question, the district court properly declined to exercise jurisdiction over the pendant state law claims set forth in the complaint. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). No extraordinary circumstances have been asserted to justify continuous jurisdiction over the pendent state claims. *See Cooley v. Pennsylvania Housing Finance Agency*, 830 F.2d 469 (3d Cir.1987). Accordingly, we will affirm the district court's dismissal of the complaint.