

Villanova University School of Law Digital Repository

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-6-2007

# FTC v. Check Investors Inc

Precedential or Non-Precedential: Precedential

Docket No. 05-3558

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"FTC v. Check Investors Inc" (2007). *2007 Decisions.* Paper 353.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/353

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos:  05-3558/3957

FEDERAL TRADE COMMISSION

v.

CHECK INVESTORS, INC.; CHECK ENFORCEMENT;
JAREDCO, INC.; BARRY S. SUSSMAN;
ELIZABETH M. SUSSMAN; CHARLES T. HUTCHINS

Charles T. Hutchins,

Appellant No. 05-3558

Case No:  05-3957

FEDERAL TRADE COMMISSION

v.

CHECK INVESTORS, INC.; CHECK ENFORCEMENT;
JAREDCO, INC.; BARRY S. SUSSMAN;
ELIZABETH M. SUSSMAN; CHARLES T. HUTCHINS

Check Investors, Inc., Check Enforcement,
Jaredco, Inc., Barry S. Sussman

Appellants No. 3957

Appeal from the United States District Court
for the District of New Jersey
(Civ. No. 03-cv-02115)
District Judge: Hon. John W. Bissell

Argued
October 4, 2006

Before: McKEE, AMBRO,  NYGAARD, *Circuit Judges*,

(Opinion filed:  September 6, 2007 )

CHARLES T. HUTCHINS, ESQ.  (Argued)
KBR LOGCAP III HQ
APO AE 09342
*Pro se*

STEPHEN ROBERT LaCHEEN, ESQ.  (Argued)
ANNE M. DIXON, ESQ.
1429 Walnut Street
Suite 1301
Philadelphia, PA 19106
*Attorneys for Appellants, Check Investors, Inc.,
Check Enforcement, Inc., Jaredco, Inc., and
Barry Sussman*

WILLIAM BLUMENTHAL, ESQ.
General Counsel, Federal Trade Commission
JOHN F. DALY, ESQ.
Deputy General Counsel for Litigation, Federal Trade
Commission
LAWRENCE DeMILLE-WAGMAN, ESQ.  (Argued)
Attorney, Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C.  20580
*Attorneys for Appellee*

OPINION

McKEE, *Circuit Judge*.

Check Investors, Inc., Check Enforcement, Inc., Jaredco,

Inc., Barry Sussman (hereinafter collectively "Check

Investors")[1] and Charles T. Hutchins[2] appeal the district court's

grant of injunctive relief and $10.2 million in fines in this action

---

[1]Barry Sussman is or was the Vice-President of Check Investors, Inc., and the President of Check Enforcement, Inc., and Jaredco, Inc.

[2]Charles T. Hutchins is or was general counsel to Check Investors, Jaredco and Check Enforcers.

3

that the Federal Trade Commission initiated against them. The FTC claimed that their debt collection practices violated the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 41 *et seq.*, and various provisions of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.* For the reasons that follow, we will affirm.

## I.  FACTS[3]

Check Investors is in the business of purchasing large numbers of checks written on accounts with insufficient funds ("NSF checks"). The payors of those checks typically wrote them in connection with retail transactions and purchases. Check Investors purchased over 2.2 million NSF checks having an estimated face value of approximately $348 million. The checks were purchased from companies such as Telecheck, Inc.,

---

[3] The facts are not in dispute.

Certegy, Inc., and Cross Check, Inc. (collectively "Telecheck").

Telecheck is in the business of guaranteeing checks tendered to pay for consumer transactions. When checks are dishonored, Telecheck pays the merchant/payee the full face value of the check, thereby making the merchant whole. The merchant therefore has no need to attempt to collect the check from the payor/customer. In return for the payment, the merchant assigns all of its rights and benefits to Telecheck, and Telecheck then attempts to collect on the defaulted check to reimburse itself for its payment.

Telecheck first attempts to collect by making three electronic re-presentments of an NSF check to the financial institution the instrument was drawn on. If unsuccessful, Telecheck then sends the payor notices and attempts to contact him/her by telephone. This process may continue for approximately sixty to ninety days. If these efforts fail,

Telecheck hires a debt collector, who makes further attempts to collect on the check from the payor. If the debt collector is not able to collect after six months to a year, Telecheck contracts with a second debt collector. Both the first and second debt collectors work on a contingency basis, and, if successful, will receive one-third of the payment received. If the second debt collector is also unsuccessful, Telecheck sells the rights it acquired from the original merchant to Check Investors, and Check Investors initiates additional collection efforts.

Initially, Check Investors collected NSF checks on behalf of large retail clients. However, by 2002 it was purchasing NSF checks from check guarantee companies such as Telecheck for pennies on the dollar and collecting on its own behalf as part of the process we have just described.

According to the Federal Trade Commission, Check Investors was the brainchild of Barry Sussman. After

graduating from law school (and after serving time in prison for attempting to collect debts by posing as an FBI agent), Sussman theorized that if a debt collection business collected only debts it actually owned based on purchasing NSF checks, it would not be subject to the FDCPA, and would therefore be free to use collection techniques prohibited by the FDCPA such as harassment and deception.

In collecting checks, Check Investors routinely added a fee of $125 or $130 to the face amount of each check; an amount that exceeded the legal limit for such fees under the laws of most states. Check Investors would then aggressively dun the defaulting payors without disclosing either the original face amount of the check, or that the amount it was demanding in "satisfaction" of the check included a fee that was higher than permitted under the laws of the applicable state.

Check Investors used both dunning letters and phone

7

calls to collect debts. However, its primary *modus operandi* was to accuse consumers of being criminals or crooks, and threatening them with arrest and criminal or civil prosecution. The collectors it employed were provided with a script that directed them to begin calls by advising consumers that a "criminal complaint recommendation" was pending, and that the consumer would be arrested and prosecuted if he/she did not pay the amount demanded in full. Collectors were allowed to personalize the approach they used, but the approach always focused on threats of prosecution. By way of example, one of Check Investor's collectors left the following message on a consumer's answering machine:

> This message is for the criminal check writer, Stephanie _____. If you think that you could rip these merchants off with your hot checks and hide behind your telephone, I guess you'll just have to explain to the judge why you stole from this merchant, from [name of merchant], with your fraudulent check. At this moment, we do not

> have any intentions of working this matter out
> with you voluntarily. You may need to turn
> yourself in to the local county sheriff's office.

Another consumer was told that if she did not pay, her children would "watch their mother being taken away in handcuffs," and they would "be bringing their mommy care packages in prison."

Check Investors also threatened consumers by sending a form collection letter that purported to be from defendant Hutchins, who as noted, *see* n.2, *supra*, is an attorney. The letter informed the recipient that Hutchins had been retained by a client who was considering taking criminal or civil action. Hutchins did not actually send the letters or sign them, he had no idea about the number of letters that were sent out purporting to be from him, and he made no inquiry about the status of any of the debts underlying the letters that were sent.[4]

---

[4] Hutchins claims that he established numerous

(continued...)

9

Check Investors' threats of prosecution were made without regard to the amount of the underlying obligation. Employees of Check Investors told one consumer who allegedly wrote an NSF check for $14.70 that she would be "sitting in jail" unless she immediately paid $144.70 (the amount of the original check plus Check Investors' additional fee of $130). Faced with the threat, the consumer paid the full amount demanded.

Check Investors' threats of prosecution were all false. It never notified law enforcement authorities, nor did it take any steps to initiate civil suit against any consumer. Indeed, perhaps because of the small face amount of many of the debts

---

[4](...continued) procedures to screen out innocent victims of fraud, identity theft, checks listed in bankruptcy, stop-payment checks and disputed checks to ensure that Check Investor's recovery actions related only to NFS checks.

10

it was collecting, Hutchins conceded that it would have been a "ridiculous proposition" to file suit.

Check Investors' tactics apparently knew no limits. It routinely contacted family members of obligors. In one case, Check Investors' repeatedly called a 64-year old mother regarding her son's debt; fearing that her son would be arrested and carted off to jail, she paid the amount of the demand. Another technique that Check Investors employed can best be described as "saturation phoning." One consumer stated that Check Investors' collectors called him 17 times in 10 minutes. Collectors also used abusive language, referring to consumers as "deadbeats," "retards," "thieves," and "idiots." The tactics often yielded results. Between January 1, 2000, and January 6, 2003, Check Investor's collection efforts netted $10.2 million from more than 42,000 consumers.

## II. DISTRICT COURT PROCEEDINGS

On May 12, 2003, the Federal Trade Commission filed a seven-count complaint in the United States District Court for the District of New Jersey against Check Investors[5] and Hutchins alleging that they had violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and various provisions the FDCPA, in their attempts to collect from consumers who had written NSF checks. More specifically, the FTC alleged that Check Investors was a "debt collector," collecting "debts", within the meaning of the FDCPA. The complaint further alleged that, in the course of collecting debts, Check Investors had violated, *inter alia*, 15 U.S.C. § 1692d (by using abusive language, and calling consumers repeatedly); § 1692e (by falsely representing that communications came from an attorney, by falsely

---

[5]Barry Sussman's wife, Elisabeth Sussman, was also named as a defendant. However, on October 5, 2004, the district court entered a Stipulation and Order settling all claims against her.

representing that the consumer would be arrested or imprisoned or had committed a crime, and by falsely threatening legal action); and § 1692f (by adding impermissible charges to the face amounts of the debts it was collecting). The complaint also alleged that many of the acts that violated the FDCPA also violated the FTC Act. The FTC sought to enjoin Check Investors' conduct and obtain restitution for injured consumers, including a refund of the money Check Investors had collected using these techniques.

The district court issued a temporary restraining order enjoining Check Investors from engaging in the conduct alleged in the FTC's complaint, and the court also froze most of Check Investors' assets.[6] On August 14, 2003, the district court

---

[6] Check Investors did not deny the tactics that FTC alleged. Rather, it insisted that the NSF obligations it was attempting to collect were not subject to the FDCPA or the
(continued...)

entered a preliminary injunction against Check Investors, which continued the injunctive provisions and the asset freeze of the TRO.

Both parties thereafter filed cross-motions for summary judgment. The district court granted the FTC's motion and denied Check Investors' motion. Check Investors did not dispute that it engaged in any of the conduct alleged in the FTC's complaint, and there was therefore no genuine issue of material fact about its collection tactics. Rather, Check Investors opposed the FTC's motion for summary judgment (and supported its own motion for summary judgment) by arguing that the FDCPA did not apply because it was collecting NSF checks that it had purchased outright from the original payees. According to Check Investors, it was therefore acting

---

[6](...continued)
FTC Act.

as a creditor collecting its own obligations rather than as debt collector collecting obligations owed to a third party.

Check Investors also argued that the payors on the NSF checks it had purchased had violated state laws pertaining to presenting "bad checks" and by committing fraud. Accordingly, in Check Investors view, the payors should be considered criminals or tortfeasors, not consumers, and they were therefore not entitled to the consumer protection of the FDCPA.

The district court rejected these arguments, in part because Check Investors presented no evidence to show that all the payors in question had the intent required for criminal or civil liability when they wrote the checks. The court also held that persons who write NSF checks are entitled to the FDCPA's protections in any event. The district court thus held that Check Investors was a "debt collector" collecting "debts" within the meaning of the FDCPA, and that it was therefore subject to the

O:\PRECEDENTIAL\2005\053558p.wpd          15

prohibitions that Act places on debt collectors' efforts to collect debts. Finally, the court held that Check Investors made material misrepresentations in the course of its collections, and that these misrepresentations also violated the FTC Act.

The district court permanently enjoined Check Investors from engaging in any debt collection activities or selling any of the debts that consumers purportedly owed to it. The court concluded that all defendants were jointly and severally liable to the FTC for restitution in the amount of $10,204,445.00. Thereafter, Hutchins (No. 05-3558), and Check Investors (No. 05-3957) appealed the court's ruling.[7]

## III. THE FAIR DEBT COLLECTION PRACTICES ACT

"The FDCPA was enacted in 1977 as an amendment to

---

[7]Check Investors has filed a brief in support of its appeal and has joined in the brief filed by Hutchins.

16

the Consumer Credit Protection Act 'to protect consumers from a host of unfair, harassing, and deceptive collection practices without imposing unnecessary restrictions on ethical debt collectors.'" *Staub v. Harris*, 626 F.2d 275, 276-77 (3d Cir. 1980) (quoting Consumer Credit Protection Act, S. Rep. No. 95-382, at 1-2 (1977), reprinted in 1977 U.S.C.C.A.N. 1695, 1696). "The primary goal of the FDCPA is to protect consumers from abusive, deceptive, and unfair debt collection practices, including threats of violence, use of obscene language, certain contacts with acquaintances of the consumer, late night phone calls, and simulated legal process." *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1324 (7th Cir. 1997) (citation omitted). "A basic tenet of the Act is that all consumers, even those who have mismanaged their financial affairs resulting in default on their debt, deserve the right to be treated in a reasonable and civil manner." *Id.*

(citation omitted).

Although Check Investors uses broad strokes to paint all of the payors of its NSF checks as deadbeats, criminals and/or tortfeasors, Congress's findings in enacting the FDCPA are to the contrary. The relevant Senate report noted, *inter alia*, that

> [o]ne of the most frequent fallacies concerning debt collection legislation is the contention that the primary beneficiaries are "deadbeats." In fact, however, there is universal agreement among scholars, law enforcement officials, and even debt collectors that the number of persons who willfully refuse to pay debts is minuscule.

S. Rep. No. 93-382, at 2 (1977), reprinted in 1977 U.S.C.C.A.N. at 1696. Rather, Congress recognized that "the vast majority of consumers who obtain credit fully intend to repay their debts. When default occurs, it is nearly always due to an unforeseen event such as unemployment, overextension, serious illness or marital difficulties or divorce."

*Id.* Congress also recognized that "[a]busive debt collection

practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." 15 U.S.C. § 1692(a). Thus, Congress concluded that "[t]he issue is not one of uncollected debts, but rather whether or not consumers must lose their civil rights and be terrorized and abused by unethical debt collectors." H.R. Rep. No. 95-131, at 3 (1977).

"In the most general terms, the FDCPA prohibits a debt collector from using certain enumerated collection methods . . . to collect a 'debt' from a consumer." *Bass*, 111 F.3d at 1324. The FDCPA prohibits debt collectors from, *inter alia*, engaging in any conduct "the natural consequence of which is to harass, oppress, or abuse any person," 15 U.S.C. § 1692d; from using "any false, deceptive, or misleading representations or means in connection with the collection of any debt," 15 U.S.C. § 1692e; or from using "unfair or unconscionable means to collect or

attempt to collect any debt," 15 U.S.C. § 1692f.

Within each broad category of prohibited conduct, the FDCPA includes examples of specific practices that are prohibited. Those prohibited practices could have been modeled on the various tactics Check Investors employed to collect the NSF checks it purchased. For example, the prohibition on harassing, oppressive or abusive practices precludes a debt collector from using abusive language, 15 U.S.C. § 1692d(2), or from repeatedly calling a consumer, 15 U.S.C. § 1692d(3). The prohibition on false, deceptive or misleading representations precludes a debt collector from falsely representing that a dunning letter was sent by an attorney, 15 U.S.C. § 1692e(3), from falsely representing that nonpayment will result in arrest or imprisonment, 15 U.S.C. § 1692e(4), or that a consumer committed a crime, 15 U.S.C. § 1692e(7). The prohibition on unfair or unconscionable

practices precludes a debt collector from adding any charge to the underlying debt unless that charge is authorized by law or the agreement creating the debt. 15 U.S.C. § 1692f(1).

The FDCPA allows consumers to sue an offending creditor for actual damages, attorney's fees and costs, as well as statutory damages up to $1,000 . 15 U.S.C. § 1692k(a). The FDCPA also provides the FTC with enforcement authority. 15 U.S.C. § 1692l(a).

## IV. THE FEDERAL TRADE COMMISSION ACT

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits, *inter alia*, "unfair or deceptive acts or practices in or affecting commerce." Section 13(b), 15 U.S.C. § 53(b), provides that "in proper cases the Commission may seek, and after proper proof, the [district] court may issue, a permanent injunction." "The deceptive acts or practices forbidden by the [FTC] Act include those used in the collection of debts." *Trans World Accounts,*

*Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir. 1979). Trans World was a debt collection agency that sent out a series of five or six dunning letters, in a format that closely resembled Western Union Telegrams, that threatened immediate legal action against the debtors if payment was not made within a specified period. *Id*. In reality, however, it took Trans World about ninety days from the receipt of the first letter to even consider whether legal action should be taken against any individual debtor. *Id*.

The FTC issued an administrative complaint charging Trans World with the commission of unfair and deceptive practices in violation of Section 5 of the FTC Act. *Id*. The complaint alleged that the letters misrepresented the imminence of legal action, and that they were deceptive in format because they were made to look like Western Union telegrams. *Id*. An administrative law judge entered a decision sustaining the allegations of the complaint, and Trans World appealed to the

22

FTC.  *Id.*  The FTC adopted, in large measure, the findings and conclusions of the ALJ and entered an order prohibiting the practices used in the collection process.  *Id.*  On Trans World's petition for review, the Court of Appeals for the Ninth Circuit found, *inter alia*, that there was substantial evidence supporting the finding of deception in the use of the letter format that closely resembled telegrams, which letters threatened legal action when no action was contemplated.  *Id*. at 215.

In *Floersheim v. FTC*, 411 F.2d 874 (9th Cir. 1969), the seller of forms used to help creditors collect debts petitioned for review of a cease and desist order of the FTC.  The court held that the evidence supported the FTC's finding that the seller's forms, which were mailed from the seller's Washington, D.C., office even though the seller lived in and sold the forms from Los Angeles, California, which repeated the words, "Washington, D.C.," and used an elaborate type style so as to

simulate legal documents, were deceptive in exploiting the assumption of many low income debtors that anything that official-looking coming from Washington, D.C., had been sent by the federal government.

## V.  DISCUSSION

Neither Check Investors nor Hutchins disputes the FTC's claim that they employed harassing and abusive tactics to collect NSF checks or that they collected amounts in excess of the amounts allowed by law.  Rather, as noted earlier, they argue that the FDCPA and the FTC Act do not apply to them because they were not collecting "debts," the people who wrote the NSF checks were not "consumers," and they were not "debt collectors," as those terms are defined in the FDCPA.[8]  Each

---

[8]These are purely legal questions over which we have plenary review. *Centerpoint Properties v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 268 (continued...)

argument is discussed separately below.[9]

## A. Are the NSF Checks "Debts" Under the FDCPA?

"A threshold requirement for application of the FDCPA is that the prohibited practices are used in an attempt to collect a 'debt.'" *Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163, 1167 (3d Cir. 1987). Congress incorporated a broad definition of both "debt" and "debt collector" into the FDCPA in order to achieve its remedial purpose. 15 U.S.C. §§ 1692a(5), 1692a(6).

The FDCPA defines a "debt" as

> *any* obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject to the transaction are primarily for personal, family, or

---

[8](...continued)
F.3d 205, 208 (3d Cir. 2001).

[9]Check Investors makes its own arguments in its appeal and has adopted the arguments Hutchins makes in his appeal.

> household purposes, whether or not such obligation has been reduced to judgment.

15 U.S.C. § 1692a(5) (emphasis added).

Appellants claim that the FDCPA does not apply to them because the NSF checks they purchased were not "debts" within the meaning of the FDCPA. They begin by noting that all 50 states criminalize the act of writing a check knowing that it will be dishonored; and that the law of many states creates a presumption of knowledge and/or willfulness when a check is written on insufficient funds and not paid within a certain period after it has been dishonored, or after the payor receives notice that it has been dishonored. Appellants also stress that since writing a fraudulent check gives rise to tort liability, and since they only attempted to collect NSF checks after a presumption of knowledge or willfulness arose under state law, their NSF checks were not "debts" within the meaning of the FDCPA

because they did not arise out of a consumer "transaction." Rather, according to Appellants, their NSF checks arose out of criminal or tortious conduct.[10]

Four Courts of Appeals have rejected this argument. and held that payment with a NSF check creates a "debt" as defined in the FDCPA. *See Bass*, 111 F.3d at 1322; *Duffy v. Landberg*, 133 F.3d 1120 (8th Cir. 1998); *Charles v. Lundgren & Assocs.*, 119 F.3d 739 (9th Cir. 1997); *Snow v. Riddle*, 143 F.3d 1350 (10 Cir. 1998).

The Court of Appeals for the Seventh Circuit was first to reject this argument in *Bass*, and its analysis has been followed by three other courts of appeals. In *Bass*, the court explained:

---

[10]However, Check Investors and Hutchins do not dispute the fact that the obligors they attempted to collect from used the checks in question to obtain "money, property, insurance, or services primarily for personal, family, or household purposes."

[T]he plain language of the Act defines "debt" quite broadly as "any obligation to pay arising out of a [consumer] transaction." In examining this definition, we first focus on the clear and absolute language in the phrase, "any obligation to pay." Such absolute language may not be alternatively read to reference only a limited set of obligations as appellants suggest. As long as the transaction creates an obligation to pay, a debt is created. *We harbor no doubt that a check evidences the drawer's obligation to pay for the purchases made with the check, and should the check be dishonored, the payment obligation remains*.

111 F.3d at 1325 (citations omitted) (emphasis added); *see also*

*Duffy*, 133 F.3d at 1123 ("Since a check written by a consumer

in a transaction for goods or services evidences the 'drawer's

obligation to pay' and this obligation remains even if the check

is dishonored, abusive collection practices related to the

dishonored check are prohibited by the FDCPA.") (quoting

*Bass*, 111 F.3d at 1325).

Although we have not yet addressed this precise issue,

we have held that a transaction's status as a "debt" under the

FDCPA must be determined at the time that the obligation first arose. *See Pollice v. National Tax Funding, L.P.*, 225 F.3d 379, 400 (3d Cir. 2000). In *Pollice*, we held that water and sewer obligations constituted a "debt" based on their status when they first arose, and they remained a "debt" after assignment to a collection agency. Thus, our view of a "debt" under the FDCPA is consistent with the four courts of appeals that have held that an NSF check is a "debt."

Nonetheless, Check Investors and Hutchins attempt to circumvent the impact of our analysis in *Pollice* by relying on our earlier decision in *Zimmerman v. HBO Affiliates Group*, 834 F.2d 1163 (3d Cir. 1987). In *Zimmerman*, we held that the FDCPA did not apply to attempts by cable television companies to collect money from people who allegedly stole cable television signals by installing illegal antennas. *Id.* at 1167-69. Check Investors and Hutchins now argue that since the payors

on its NSF checks were also subject to criminal or tort liability, *Zimmerman* compels the conclusion that the FDCPA does not apply to their collection efforts. We disagree.

In *Zimmerman*, we explained that the FDCPA was enacted to protect people who have "contracted for goods or services and [are] unable to pay for them," and that it was not intended to "protect against a perceived problem with the use of abusive practices in collecting tort settlements from alleged tortfeasors through threats of legal action." *Id.* at 1168. We also explained this in *Pollice*, 225 F.3d at 401 n.24, by noting: "[c]learly, there was no 'debt' in *Zimmerman* because the obligations arose out of a theft rather than a 'transaction.'"

Check Investors and Hutchins argue that the payors on their NSF checks are similarly situated to the "consumers" who stole cable television signals in *Zimmerman*, and that, like those "consumers," the payors here are not entitled to the protection

embodied in the FDCPA because they are criminals and tortfeasors rather than "consumers." They argue that, as in *Zimmerman*, no "debt" was created by executing the NSF checks here because there was no "transaction," as that term is commonly understood and as it is used in the FDCPA.

As the court explained in *Bass* when rejecting identical arguments there:

> Appellants misstate the law when they categorize all dishonored checks as criminal and tortious. Both under the common law of fraud, a specific intent crime, and under most criminal statutes which specifically address dishonored checks, liability attaches only if the drawer either knew or intended that the check be dishonored *at the time the check was drawn*. A bank may refuse payment on a check for a variety of reasons lacking in the necessary fraudulent intent: administrative holds on the account of which the drawer is unaware, bank error, and the drawer's reliance on deposited checks that themselves are dishonored, to name a few. Even when the drawer is at fault for the dishonor, the requisite intent may be absent – for example, when the drawer makes a simple miscalculation or has a

subsequent emergency need for funds.

> We recognize that by the time a dishonored check has been turned over to a third party collector, the issuer has typically received notice of dishonor yet has still refused to pay. Nevertheless, an issuer whose intention not to pay the check arises only at some point *after* it is issued has still not, in most jurisdictions, committed a fraudulent or criminal act. The requisite knowledge or intent that the check be dishonored must arise at the time the check is written. We therefore must reject appellants' argument that all dishonored checks are fraudulent and thus not covered by the [FDCPA].

111 F.3d at 1329 (emphasis in original) (footnote omitted).

Moreover, even if some of the payors of NSF checks had engaged in fraud at the time of the transaction, the court held in *Bass* that there is no "fraud exception" in the FDCPA. Given the explicit and unambiguous text of the FDCPA, we agree.

In *Bass*, a debt collector argued that the FDCPA should not apply to debts it was collecting because it was attempting to collect an NSF check that was presumed to be fraudulent under

Wisconsin law. 111 F.3d at 1329. The court of appeals rejected that argument because the presumption that the check writer engaged in fraud was rebuttable under Wisconsin law, and because the debt collector had not made the showing required to establish fraudulent intent under state law. *Id.* In rejecting the defendants' argument, the court commented that, even if the requisite intent had been established, the court would be reluctant to "create a fraud exception where none exists in the [FDCPA's] text." *Id.* at 1329-30. The court explained:

> A review of the legislative history reveals that Congress considered the entire field of defaulting debtors, stating its belief that most debtors fully intended to repay their debts. "Most" is not "all," however, yet Congress still chose not to exempt debt collectors from following the Act if they could prove that the consumer intended his check to be dishonored or accepted credit from a merchant intending default. No section of the Act requires an inquiry into worthiness of the debtor, or purports to protect only "deserving" debtors. To the contrary, Congress has clearly indicated its belief that no consumer deserves to be abused in

the collection process. Moreover, we think that such a fraud exception would violate the spirit of the Act. The Act's singular focus is on curbing abusive and deceptive collection practices, not abusive and deceptive consumer payment practices. We are not unaware that in some cases . . . the absence of a fraud exception will allow consumers who intend to pass worthless checks to invoke the protections of the FDCPA. . . . Absent an explicit showing that Congress intended a fraud exception to the Act, the wrong occasioned by debtor fraud is more appropriately redressed under the statutory and common law remedies already in place, not by a judicially-created exception that selectively gives a green light to the very abuses proscribed by the Act.

*Id.* at 1330.

The court thereafter amplified this discussion in *Keele v.*

*Wexler*, 149 F.3d 589 (7th Cir. 1998). There, the court

explained:

We touched upon a similar request in *Bass* without formally deciding the issue, but did express at length "our discomfort with the proposition that the courts should create a fraud exception where none exists in the Act's text." Unfortunately for the [debt collector], this "discomfort" has not subsided since *Bass*, and it is time we put to rest any lingering doubts as to the nonexistence of a fraud exception to the FDCPA.

*Id*. at 595 (citation omitted). The court's analysis continued:

> [T]he FDCPA's legislative history reflects that Congress acknowledged there may be a "number of persons who willfully refuse to pay just debts," but apparently "believe[d] that the serious and widespread abuses" of debt collectors outweighed the necessity to carve out an exception for these so called "deadbeats." If the Act was designed to protect those who willfully refused to pay their debts, it makes little sense why consumers who write checks, knowing they will be dishonored, should not enjoy the same protections.

*Id.* at 596 (citations omitted).

We agree that, given the legislative history of the FDCPA, its structure and text, we could not craft the kind of fraud exception that underlies the arguments of Check Investors without amending the statute.

## B. The Payors of the NSF Checks are "Consumers" under the FDCPA.

As noted earlier, "[t]he FDCPA was enacted in 1997 as an amendment to the Consumer Credit Protection Act to protect

consumers from a host of unfair, harassing, and deceptive

collection practices without imposing unnecessary restrictions

on ethical debt collectors." *Staub*, 626 F.2d at 276-77 (citation

and internal quotations omitted). Check Investors and Hutchins

argue that the payors of the NSF checks are not "consumers"

and therefore are not protected by the FDCPA. More

specifically, they argue that

> [a]n individual's conduct, when taken as a whole,
> determines whether he or she qualifies as a
> consumer for FDCPA purposes. An individual
> who issues a NSF check or a closed account
> check, in exchange for money, goods, services or
> insurance, and who subsequently fails to make
> restitution within the criminal code statutory
> period established by the state legislature, is not
> a FDCPA consumer because the individual has
> not acted like a consumer.

However, the argument ignores that the FTC's cause of action

is controlled by the FDCPA. That governing statute defines

"consumer" as "*any* natural person obligated or allegedly

obligated to pay *any* debt." 15 U.S.C. § 1692a(3) (emphasis added). Even if we accept the claim that these payors are criminals and tortfeasors, those labels would advance neither our inquiry, nor Appellants' position, because "any" is all inclusive and does not exclude criminals or tortfeasors. Rather, it unambiguously includes them. As noted above in our discussion of the analysis in *Bass* and *Keele*, it is clear that Congress realized that some people who write "bad checks" do so knowingly and willfully and that their conduct is fraudulent. It is just as clear that Congress enacted a definition of "consumer" that did not exclude such persons from the protections they would otherwise be afforded under the FDCPA. Yet, Appellants' argument requires that we ignore the phrase: "*any* natural person," that Congress used to define "consumer."

Just as the obligations underlying the NSF checks are

"debts" that the payor remains obligated to pay, *see Duffy*, 133 F.3d at 1123 ("[A] check written by a consumer in a transaction for goods or services evidences the "drawer's obligation to pay" and this obligation remains even if the check is dishonored. . . ."), the payors of those checks are "consumers" within the meaning of the FDCPA.

## C. Appellants are "Debt Collectors" and not "Creditors" Under the FDCPA.

"The FDCPA's provisions generally apply only to debt collectors." *Pollice*, 225 F.3d at 403 (citation and internal quotations omitted). "Creditors – as opposed to debt collectors – generally are not subject to the FDCPA." *Id.* (citation and internal quotations omitted). A "debt collector" is broadly defined as one who attempts to collect debts "owed or due or asserted to be owed or due another," 15 U.S.C. § 1692a(6). A "creditor" is one who "offers or extends to offer credit creating

a debt or to whom a debt is owed."  15 U.S.C. § 1692(a)(4).

The district court held that Check Investors and Hutchins[11] are "debt collectors" as defined by the FDCPA because Check Investors obtained the "debts," i.e., the NSF checks, after they were in default.[12]  It relied on our decision in *Pollice v. National Tax Funding, L.P.*, *supra*.  There, National Tax Funding ("NTF") purchased homeowner's water and sewer obligations from a municipality and sought to collect on those

---

[11]Attorneys who regularly engage in debt collection or debt collection litigation are covered by the FDCPA, and their litigation activities must comply with the requirements of the FDCPA.  *Heintz v. Jenkins*, 514 U.S. 291, 292 (1995).

[12]Hutchins contends that because a check is an unconditional promise to pay, a check can never be in default.  We disagree.  "Default" is "the omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due."  Blacks Law Dictionary 449 (8th ed. 2004).  Because the checks Check Investors purchased from Telecheck had already been dishonored, they were in default when purchased.  *Holmes v. Telecredit Service Corp.*, 735 F. Supp. 1289, 1293 (D. Del. 1990).

obligations for its own benefit. We held that water and sewer

obligations are "debts" within the meaning of the FDCPA. We

also held that NTF was a "debt collector" and that the district

court should not have dismissed FDCPA claims against it. We

explained:

> Courts have indicated that an assignee of an
> obligation is not a "debt collector" if the
> obligation is not in default at the time of
> assignment; conversely, an assignee may be
> deemed a "debt collector" if the obligation is
> already in default when it is assigned. . . . Here,
> there is no dispute that the various claims
> assigned to NTF were in default prior to their
> assignment to NTF. Further, there is no question
> that the "principal purpose" of NTF's business is
> the "collection of any debts," namely defaulted
> obligations which it purchases from
> municipalities.

225 F.3d at 403-404 (citations omitted). This is equally true of

Hutchins and Check Investors. Nevertheless, they contend that

the district court's holding that they are "debt collectors" was

error because they are actually "creditors"[13] collecting debts

actually owed to them, as opposed to "debt collectors"

collecting obligations owed to someone else. The FDCPA

defines "creditor" as

> any person who offers or extends credit creating
> a debt or *to whom a debt is owed*, but such term
> does not include any person to the extent he
> receives an assignment or transfer of a debt in
> default solely for the purpose of facilitating
> collection of such debt for another.

15 U.S.C. § 1692a(4) (emphasis added). Appellants contend

that because Check Investors bought the NSF checks from

Telecheck, Check Investors is the actual owner of those checks

and is therefore not collecting "debts of another," as a debt

collector would. Rather, according to Appellants, Check

Investors is actually the entity "to whom a debt is owed." They

---

[13]The district court held that Check Investors and
Hutchins were "debt collectors" as defined in the FDCPA. It
did not address their claim that they were "creditors."

claim further that because Check Investors is owed the debt, it did not "receive[] an assignment or transfer" of the NSF checks "solely for the purpose of" collecting the debt for Telecheck. Thus, Appellants argue that Check Investors satisfies the statutory definition of a "creditor," and, therefore, they are not subject to the provisions of the FDCPA. Although the argument is rather clever, it is wrong. It would elevate form over substance and weave a technical loophole into the fabric of the FDCPA big enough to devour all of the protections Congress intended in enacting that legislation.

Admittedly, Check Investors appears at first blush to satisfy the statutory definition of a creditor. As the Court of Appeals for the Seventh Circuit noted in *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003), "for debts that do not originate with the one attempting collection, but are acquired from another, the collection activity related to that debt

could logically fall into either category."

However, as to a specific debt, one cannot be both a "creditor" and a "debt collector," as defined in the FDCPA, because those terms are mutually exclusive. As the court explained in *Schlosser*, "[i]f the one who acquired the debt continues to service it, it is acting much like the original creditor that created the debt. On the other hand, if it simply acquires the debt for collection, it is acting more like a debt collector." *Id.* Thus, in determining if one is a "creditor" or a "debt collector," courts have focused on the status of the debt at the time it was acquired. 15 U.S.C. § 1692a controls that inquiry. That provision provides in relevant part:

> (6) The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. . . . The

> term does not include –
> (F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . (iii) concerns a debt which was not in default at the time it was obtained by such person. . . .

15 U.S.C. § 1692a(6)(F)(iii). In *Pollice*, we relied on this provision of the FDCPA to hold that one attempting to collect a debt is a "debt collector" under the FDCPA if the debt in question was in default when acquired. Conversely, we concluded that § 1692a means that an entity is a creditor if the debt it is attempting to collect was not in default when it was acquired. 225 F.3d at 403-04. Other courts agree. *See Schlosser*, 323 F.3d at 536; *Bailey v. Security Nat'l Servicing Corp.*, 154 F.3d 384, 387 (7th Cir. 1998); *Whitaker v. Ameritech Corp.*, 129 F.3d 952, 958 (7th Cir. 1997); *Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103, 106-07 (6th Cir. 1996); *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985).

Admittedly, focusing on the status of the debt when it was acquired overlooks the fact that the person engaging in the collection activity may actually be owed the debt and is, therefore, at least nominally a creditor. Nevertheless, pursuant to § 1692a, Congress has unambiguously directed our focus to the time the debt was acquired in determining whether one is acting as a creditor or debt collector under the FDCPA. The legislative history explains the wisdom of that provision. The term "debt collector," subject to the exclusions discussed below, was intended to cover all third persons who regularly collect debts. "The primary persons intended to be covered are independent debt collectors." S. Rep. No. 95-382, at 2, 1997 U.S.C.A.A. at 1697. The Senate Committee explained that the FDCPA was limited to third-party collectors of past due debts because, unlike creditors, "who generally are restrained by the desire to protect their good will when collecting past due

accounts," independent collectors are likely to have "no future contact with the consumer and often are unconcerned with the consumer's opinion of them." *Id.* at 1696.

Thus, as the court explained in *Schlosser*:

> Focusing on the status of the obligation asserted by the assignee is reasonable in light of the conduct regulated by the statute. For those who acquire debts originated by others, the distinction drawn by the statute – whether the loan was in default at the time of the assignment – makes sense as an indication of whether the activity directed at the consumer will be servicing or collection. If the loan is current when it is acquired, the relationship between the assignee and the debtor is, for purposes of regulating communications and collections practices, effectively the same as that between originator and the debtor. If the loan is in default, no ongoing relationship is likely and the only activity will be collection.

323 F.3d at 538.

Here, Check Investors acquired the defaulted checks only for collection purposes. Indeed, it is in business to do just that:

acquire seriously defaulted debt, the age of which allows Check

Investors to acquire it for a few pennies on the dollar. The low

cost of acquisition allows for substantial profit if the checks are

subsequently collected.[14] This is particularly true given the size

of the "fees" that Check Investors adds on to each check.

The fact that the NSF checks were purchased and owned

outright by Check Investors, rather than Check Investors merely

receiving an assignment of the rights of the original payee is

therefore irrelevant for purposes of determining whether Check

Investors was acting as a debt collector or creditor. Check

Investors clearly had no intention of servicing the debt. Check

Investors and Hutchins do not dispute the FTC's claim that they

---

[14]This is particularly true given the size of the "fees" that Check Investors adds to each check. Their tactics then allow them a remarkable measure of success even though prior debt collection efforts have failed. The result is a very profitable enterprise.

47

employed harassing and abusive tactics to collect the debts they acquired and added "collection fees" that exceeded limitations imposed by state laws. No merchant worried about goodwill or the future of his/her business would have engaged in the kind of conduct that was the daily fare of the collectors at Check Investors. Neither Check Investors nor Hutchinson intended any future contact with the payees of the NSF checks they acquired, and their collection practices reflected as much. The collectors working there resorted to whatever harassment appeared likely to succeed; the only limit appears to have been a given tactic's likelihood of bearing fruit by yielding a profit. If the future of Appellants' business was in any way dependent upon their goodwill, they would not have dreamed of unleashing their collectors in this manner. Not only do we conclude that Appellants are "debt collectors" rather than "creditors," we believe that their course of conduct exemplifies

why Congress enacted the FDCPA and the wisdom of doing so. It also shows why Congress has directed us to focus on whether a debt was in default when acquired to determine the status of "creditor" vs. "debt collector."

## D.  The Federal Trade Commission Act.

As noted earlier, Hutchins and Check Investors do not dispute the FTC's claim that their collection practices constituted unfair and deceptive practices under the FTC Act. Instead, they argue that the payors of their NSF checks were not "consumers."  "[T]he deceptive acts or practices forbidden by the [FTC Act] include those used in the collection of debts." *Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir. 1979).  Accordingly, we must also reject the argument that the payors of the NSF checks were not "consumers" under the FTC Act.

Nevertheless, Check Investors argues that

> [t]his is not a case where consumers are being solicited to buy time-shares in non-existent condos or swamp land in Florida, and that the district court erred in determining that the Check Investors' practices were, in fact, deceptive as to a consumer.

Selling time shares for swamp land in Florida is but one kind of deceptive business practice. The collection techniques involved here are another. Moreover, Check Investors offered nothing in the district court to challenge the FTC's allegations that its collection practices included material misrepresentations in violation of the FTC Act. Accordingly, we will not consider that argument, raised for the first time on appeal, absent a compelling circumstance requiring us to consider it. *Srien v. Frankford Trust Co.*, 323 F.3d 214, 224 n.8 (3d Cir. 2003). Check Investors does not allege the existence of any compelling circumstance, and we can think of none. Thus, we will not consider its argument that the district court erred in finding that

its practices were deceptive to a consumer.

## VI. CONCLUSION

For all of the above reasons, we will affirm the district court.

51