Filed 3/29/13; pub. order 4/25/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| HERITAGE PACIFIC FINANCIAL, LLC,<br><br>    Plaintiff, Cross-defendant, and Appellant,<br><br>v.<br><br>MARIBEL MONROY,<br><br>    Defendant, Cross-complainant, and Respondent. | A135274, A136043<br><br>(Contra Costa County<br>Super. Ct. No. C10-01607) |

Maribel Monroy executed two promissory notes with WMC Mortgage Corp. (WMC) when purchasing a home in Richmond, California in 2006 (the Richmond property). After a foreclosure on the senior deed of trust, Heritage Pacific Financial, LLC (Heritage) acquired Monroy's second promissory note from WMC. Heritage sent Monroy a letter attached to a complaint and summons advising her that Heritage had filed a lawsuit against her alleging various fraud claims. The letter admonished that any misinformation provided by Monroy on her original loan application with WMC could result in civil liability and that Heritage would proceed with a lawsuit if it were unable to resolve the matter with Monroy. Monroy filed a cross-complaint against Heritage, alleging violations of the Rosenthal Fair Debt Collection Practices Act (Rosenthal Act) and the federal Fair Debt Collection Practices Act (FDCPA or the Act).

After permitting Heritage to amend its complaint three times, the trial court sustained Monroy's demurrer against Heritage's pleading on the grounds that Heritage

1

had failed to provide or allege an assignment agreement with sufficient particularity to demonstrate that the assignment of Monroy's promissory note included an intent to assign WMC's tort claims against the borrower. Thereafter, Monroy moved for summary judgment or adjudication on her cross-complaint. The court denied her motion as to her claim of a violation of the Rosenthal Act but granted the motion as to a violation of the FDCPA, on the condition that Monroy agree to damages in the amount of one dollar. Monroy agreed to the damage award of one dollar and the court entered judgment in her favor. Subsequently, Monroy requested attorney fees and costs under title 15 of the United States Code section 1692k(a)(3), and the court found that Monroy was the prevailing party and entitled to attorney fees and costs in the amount of $89,489.60. The court concluded that the issues regarding the cross-complaint and complaint were interrelated and could not be reasonably separated. Heritage separately appealed the judgment and the award of attorney fees and we, on our own motion, consolidated the appeals.

On appeal, Heritage argues that it sufficiently set forth allegations to support a claim that the assignment from WMC included an intent to assign WMC's tort claims against Monroy and that the trial court improperly weighed the evidence when sustaining the demurrer without leave to amend. It also contends that triable issues of fact exist regarding Monroy's FDCPA claim and therefore the trial court erred in granting summary judgment. Finally, it objects to the award and amount of attorney fees. We are not persuaded by Heritage's argument, and affirm the judgment and the award of attorney fees.

## BACKGROUND

Monroy is Spanish speaking and works as a housekeeper. On November 26, 2006, she purchased the Richmond property for $425,000. Monroy executed two promissory notes with WMC. She obtained a senior mortgage loan for $340,000 and a junior mortgage loan for $85,000 (the note, the second note, or the promissory note). Both promissory notes were secured by a deed of trust on the property. The beneficiary of each deed of trust was Mortgage Electronic Servicing Corporation.

2

Both the first and second promissory notes provided in the first paragraph the following: "I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note will be called the 'Note holder.'" Monroy signed a form stating that the information in the loan application was true and correct and acknowledged that "any intentional or negligent misrepresentation of this information . . . may result in civil liability, including monetary damages."

On her loan application, Monroy claimed to make $9,200 per month as the owner of Maribel's Cleaning Services. Monroy signed a certification that she did not have a family or business relationship with the seller of the property.

The seller of the Richmond property was Marvin E. Monroy, Monroy's son. He received $53,258.49 as a result of the sale. Monroy bought the house from her son because he was not able to make the mortgage payments.

At this same time, on November 20, 2006, property in Manteca (the Manteca property) was purchased in Monroy's name and a promissory note was executed for the amount of $312,000. According to Monroy, the Manteca property was purchased under her name as a result of identity theft. She stated that in 2006 she was unaware of this transaction. She averred that she has never been to the Manteca Property. In 2008, Monroy submitted to the credit-reporting agency a verified fraud statement. In this statement, she asserted that a mortgage in Manteca was opened in her name as a result of the identity theft.

Monroy failed to make her mortgage payments on the Richmond property, which resulted in a foreclosure on the senior deed of trust on August 28, 2008.

On May 22, 2009, Heritage acquired Monroy's second promissory note as part of a "larger pool of loans." Heritage is a limited liability company organized under the laws of the State of Texas and its principal place of business is in Dallas County, Texas. Heritage sent Monroy a letter stating that it had purchased her second unpaid loan. Heritage was unsuccessful in speaking with Monroy. In October 2009, Heritage sent by certified mail another notice of the transfer of the ownership of the note. Heritage sent

Monroy a third notice in December 2009. In this notice, it asserted that she was obligated to pay Heritage the unpaid balance on the second promissory note.

Heritage did further research and concluded that Monroy had misrepresented her income and submitted false documentation regarding her income on her original loan application. Heritage also discovered that Monroy's son was the seller of the Richmond property. Additionally, it uncovered the documents related to the Manteca property.

On June 1, 2010, Heritage filed a complaint against Monroy for intentional misrepresentation, fraudulent concealment, promise without intent to perform, and negligent misrepresentation based on her loan application with WMC. Heritage alleged that it was not barred from pursuing its action by any antideficiency statute because it was not seeking a deficiency judgment for the balance of a promissory note following foreclosure, but was seeking a judgment for Monroy's alleged fraud in connection with her loan application. Heritage requested actual damages in the amount of $85,000, the sum owed on the promissory note, and also asked for punitive damages.

On June 27, 2010, Monroy received a letter dated May 25, 2010, from Heritage that attached Heritage's summons and complaint against her. The letter advised her about its civil action against her and stated in bold type: "Should you wish to voluntarily provide us with your federal tax return transcripts, a signed copy of Form 4506-T (Request for Transcript of Tax Return) and/or your proof of residency in the property made the subject of our Complaint, please contact us at your earliest convenience . . . ." The letter directed: "If you notify us of your intent to voluntarily provide us with this documentation, we may suspend actions to provide you with an opportunity to provide us with copies of the same." The letter told Monroy to notify Heritage if she wanted to provide a copy of her promissory note as Heritage, "as assignee of the promissory note, has the right to reverify the information contained therein." The letter admonished Monroy that "any misinformation or misrepresentations provided in the [loan] application are a violation of federal law and may result in 'civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation' for which Heritage . . . currently seeks." The letter warned that if

4

Heritage was unable to resolve the matter by the date Monroy's answer to the complaint was due, Heritage would "have no other option but to proceed with litigation against" her. The letter declared that it was "from a debt collector" and was "an attempt to collect a debt."

On July 28, 2010, Monroy answered Heritage's complaint and filed a cross-complaint alleging violations of the Rosenthal Act (Civ. Code, § 1788 et seq.) and the FDCPA (15 U.S.C. § 1692 et seq.). A little more than a month later, on September 2, Heritage demurred to the cross-complaint and filed a motion to strike the pleading. On November 16, 2010, Monroy filed a motion for judgment on the pleadings on Heritage's complaint.

On December 28, 2010, the trial court overruled Heritage's demurrer to Monroy's cross-complaint and denied its motion to strike. On this same date, the court granted with leave to amend Monroy's motion for judgment on Heritage's complaint. The court explained that Heritage had failed to allege that the lender had assigned its fraud claims to it and Heritage had conceded that no California legal authority held that the assignment of a promissory note automatically constituted an assignment of a lender's fraud claims. The court added: "If [Heritage] chooses to amend its complaint so as to specifically allege an assignment of the lender's fraud claims, [Heritage] shall make such allegations with the particularity required of a fraud cause of action, and [Heritage] shall attach as an exhibit to the amended complaint a full and legible copy of any written assignment agreement."

Heritage filed its first amended complaint for the same four causes of action on December 23, 2010. Heritage attached Monroy's second promissory note for $85,000, and alleged in the pleading that the assignment was recorded on the last page of the promissory note.

Monroy demurred to the first amended complaint. On April 7, 2011, the trial court sustained Monroy's demurrer "with one last opportunity" for Heritage to amend. (Bold omitted.) The court explained that Heritage had "still failed to adequately allege an assignment of the original lender's tort claims, as distinct from an assignment of the

5

original lender's contractual rights under the subject promissory note." The court cited *Sunburst Bank v. Executive Life Ins. Co.* (1994) 24 Cal.App.4th 1156, 1164. The court concluded that Heritage had "not attached to its complaint a written assignment agreement, as specified in the court's ruling on the motion for judgment on the pleadings, and [Heritage] ha[d] not alleged the formation of an oral assignment agreement."

The trial court noted in the order that Heritage had represented at oral argument that it would amend the pleading to allege "the existence of either a written assignment of the original lender's tort claims, or an assignment agreement implied in fact from circumstances other than the mere assignment of contractual rights." The court admonished Heritage that its future pleading must "allege with the particularity required of a fraud cause of action all the circumstances showing the formation and terms" of an implied agreement if Heritage was relying on an assignment implied in fact. The amended complaint also needed to allege "whether the subject promissory note was assigned before or after foreclosure of the first deed of trust and the corresponding extinguishment of the second deed of trust securing the promissory note."

On May 10, 2011, Heritage filed its second amended complaint (the SAC). The SAC again set forth claims for intentional misrepresentation, fraudulent concealment, promise without intent to perform, and negligent misrepresentation. Heritage alleged that after the foreclosure on the first deed of trust, WMC sold Monroy's promissory note secured by the second deed of trust on the Richmond property and "assigned any and all rights WMC may have including but not limited to any right to fraud claims against [Monroy]. Such assignment is evidenced by signature and stamp of the secretary of WMC . . . on the last page of the note . . . ." Heritage further alleged: "In assigning [Monroy's] loan, [Heritage] as assignee of WMC obtained all rights, title and interest in and to the mortgage loan by [Monroy]. The assignment to [Heritage] included assignment of the original lender's (WMC) tort claim. The assignment of tort claims is implied in the language of the loan sell agreement to [Heritage] including but not limited to language such as 'Seller does hereby sell, assign and convey to Buyer, its successors and assigns, all right, title and interest in the loan.' The loan sell agreement also provided

6

that 'the Seller transfers assign, set-over, quitclaim and convey to Buyer all right, title and interest of the Seller in the mortgage loan.' "

The SAC also added the following language: "The assignment of the tort claim is also implied by conduct of the parties in the secondary mortgage market as it is custom and practice in the mortgage industry to assign any and all rights and interests including any right to tort claim against the borrower when selling mortgage loan. [Heritage] alleges that based on the conduct of the parties and the language included in the buy sell agreement of the loan, and the custom and practice of lenders such as WMC, the assignment of [Monroy's] loan by WMC included assignment of any and all tort claims." The SAC also asserted that the language of the loan application signed by Monroy implied the assignment of tort claims.

Monroy demurred to the SAC, and Heritage attached a declaration of Diane Taylor, a representative for WMC Mortgage, LLC, to its "sur-reply in support" of its opposition to Monroy's demurrer. Taylor's declaration dated August 4, 2011, stated: "As Assistant Secretary, I am authorized to speak on behalf of WMC Mortgage, LLC, successor to WMC . . . ." She stated that WMC relied on the information provided by the borrower applying for a loan to determine the borrower's "eligibility for the products offered." She stated: "When WMC sold its mortgage loans to third parties, WMC assigned *all* of its legal rights (in tort as well as contract), as the originating lender, to the buyer—including, but not limited to, the right to recover against a borrower for fraud." (Underline omitted.)

On August 15, 2011, the trial court filed its order sustaining without leave to amend Monroy's demurrer to Heritage's SAC. The court explained: "Despite being afforded an opportunity to amend, [Heritage] has still failed to adequately allege an assignment of the original lender's tort claims, as distinct from an assignment of the original lender's contractual rights under the subject promissory note. [Citation.] [Heritage] has not attached to its complaint a written assignment agreement . . . , and [Heritage] has not adequately alleged the formation of an oral assignment agreement."

7

The trial court stated that there was an independent ground for sustaining the demurrer without leave to amend. The SAC stated that the promissory note was assigned after foreclosure of the first deed of trust and the corresponding extinguishment of the second deed of trust securing the promissory note. The court found that "there was no underlying property interest supporting an incidental assignment of the original lender's fraud claims."

On November 18, 2011, Monroy filed a motion for summary judgment or summary adjudication on her cross-complaint. Monroy asserted that Heritage was involved in the business practice of filing invalid fraud claims to avoid California's antideficiency laws in order to collect on nonrecourse debts or convert them into recourse default judgments. With regard to the claim of violating the FDCPA, Monroy alleged that Heritage was a debt collector and was engaged in a deceptive debt collections practice within the meaning of title 15, United States Code sections1692d, 1692e, and 1692f. Monroy cited the letter Heritage sent her after it had filed the lawsuit against her. Monroy also asserted that Heritage had violated provisions of the Rosenthal Act under Civil Code sections 1788.17 and 1788.13, subdivision (k). Monroy claimed that she was entitled to $1,000 for Heritage's violation of the FDCPA and $1,000 for Heritage's violation of the Rosenthal Act.

Heritage opposed the motion for summary judgment and also requested a continuance to conduct additional discovery. In its opposition to Monroy's motion for summary judgment, Heritage agreed that it was a debt collector but disputed the contention that the FDCPA applied. Heritage argued that the FDCPA did not apply because Monroy bought the Richmond property for her son and also purchased a home in Manteca. It also disputed the allegation that it engaged in deceptive debt collections practices within the meaning of the FDCPA or that it violated the Rosenthal Act.

On February 21, 2012, the trial court issued its order granting in part and denying in part Monroy's motion for summary adjudication on her cross-complaint. The court granted Monroy's motion as to her claim that Heritage violated the FDCPA. The court found that Heritage's conduct in threatening Monroy with the prosecution of legal claims

8

that had no merit violated the FDCPA. The court noted that Heritage had made a binding judicial admission that it received the assignment of Monroy's note after the foreclosure of the first deed of trust, and that event extinguished the second deed of trust securing Monroy's note. The court advised that it could not grant summary adjudication on her cause of action for monetary damages because the issue of the amount of damages remained unresolved; it thus awarded statutory damages in the nominal amount of one dollar. The court added: "If Monroy insists on receiving a greater amount, then summary adjudication must be denied and the matter must proceed to trial."

The trial court denied Monroy's summary adjudication motion with regard to her claim that Heritage violated the Rosenthal Act. The court concluded there was a triable issue of fact as to Heritage's statutory "unclean hands" defense. The court also sustained a number of Heritage's objections to the declaration of Monroy's counsel.

The trial court denied Heritage's request for a continuance to conduct additional discovery. Heritage's four discovery motions were set for a hearing 10 days after the scheduled trial date and thus the court found that Heritage's discovery requests were untimely. Further, the court found that there was no good cause for granting a continuance.

On March 12, 2012, the trial court filed its entry of judgment in favor of Monroy and against Heritage and awarded Monroy nominal statutory damages of one dollar on her cross-complaint, the maximum sum she could receive without a trial on her FDCPA claim. The order stated that Monroy was the "prevailing party."

Heritage filed a timely notice of appeal.

On March 23, 2012, Monroy filed a memorandum of costs. On May 10, 2012, Monroy filed her motion for attorney fees and costs under title 15 of the United States Code section 1692k(a)(3). Heritage filed its memorandum in opposition on June 6, 2012.

The trial court held a hearing on Monroy's fee motion on June 19, 2012. At the conclusion of the hearing, the court stated it was granting Monroy's motion. The court explained: "As the judge in this case, I did go over the billings and I didn't see anything

9

that I could say was unreasonable for hours spent on certain tasks. And I felt the hourly rate was within the acceptable parameters for Bay Area attorneys."

On July 10, 2012, the court filed its order granting Monroy's motion for an award of attorney fees and expenses. The order stated that Monroy was the prevailing party and entitled "to the full amount of her attorney's fees relating to the FDCPA claim as well as to Heritage's complaint." The court added: "The issues are synonymous and interrelated and cannot reasonably be separated." The court concluded that counsel's hourly fee rate of $450 was "within acceptable parameters for attorneys of [counsel's] skill and experience practicing" in the San Francisco Bay area, and that the time spent was 194.5 hours. The court denied the enhancement requested. The court awarded fees in the amount of $87,525 ($450 x 194.5). The court awarded litigation expenses in the amount of $1,964.60.

On this same date, July 10, 2102, the trial court entered an amended judgment, stating that it had sustained with prejudice Monroy's demurrer to Heritage's SAC, and had granted Monroy's motion for summary adjudication on her claim in her cross-complaint for violations of the FDCPA. The court repeated that Monroy shall take statutory damages of one dollar on her cross-complaint, the maximum she could receive without a trial. The court stated that Monroy was the prevailing party and awarded her $89,489.60 for attorney fees and litigation costs and expenses ($87,525 + $1,964.60). Thus, the total judgment in favor of Monroy and against Heritage was $89,490.60 ($89,489.60 + $1.00 in damages).

Heritage filed a timely notice of appeal from the order awarding attorney fees. This court on its own motion consolidated both of Heritage's appeals.

On November 8, 2012, Monroy filed a request for judicial notice of an order in a class certification lawsuit against Heritage and of Heritage's requests for default judgments against other plaintiffs in a different lawsuit. Heritage opposed the request and argued that Monroy is asking this court to take judicial notice of facts in documents and these facts may not be true. On December 5, 2012, we issued an order that the opposed request for judicial notice would be decided with the merits of the appeal.

10

" 'Taking judicial notice of a document is not the same as accepting the truth of its contents or accepting a particular interpretation of its meaning.' [Citation.] While courts take judicial notice of public records, they do not take notice of the truth of matters stated therein. [Citation.] 'When judicial notice is taken of a document, . . . the truthfulness and proper interpretation of the document are disputable.' [Citation.]" (*Herrera v. Deutsche Bank National Trust Co.* (2011) 196 Cal.App.4th 1366, 1375.) Accordingly, we take judicial notice of the existence of these court documents (Evid. Code, §§ 452, subd. (d), 459, subd. (a)), but do not take notice of the disputed facts in the documents.

## DISCUSSION

### I. *The Demurrer against Heritage's SAC*

### A. *The Standard of Review, The Pleading Requirements for Alleging Fraud, and the Burden of Proof When Alleging an Assignment*

The trial court sustained Monroy's demurrer against Heritage's SAC without leave to amend. The standard of review governing an appeal from the judgment after the trial court sustains a demurrer without leave to amend is well established. " 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

Here, Heritage alleged that it had a right to pursue misrepresentations Monroy made in her loan application to WMC based on a claim that WMC assigned its torts claims against Monroy to it. "The burden of proving an assignment falls upon the party

11

asserting rights thereunder [citations]." (*Cockerell v. Title Ins. & Trust Co.* (1954) 42 Cal.2d 284, 292.)  An assignment agreement "must describe the subject matter of the assignment with sufficient particularity to identify the rights assigned." (*Mission Valley East, Inc. v. County of Kern* (1981) 120 Cal.App.3d 89, 97.)  An assignment is "a manifestation to another person by the owner of the right indicating his [or her] intention to transfer, without further action or manifestation of intention, the right to such other person, or to a third person." (*Cockerel,* at p. 291.)  As with contracts generally, the nature of an assignment is determined by ascertaining the intent of the parties. (*Cambridge Co. v. City of Elsinore* (1922) 57 Cal.App. 245.)

Furthermore, the policy of liberal construction of the pleadings does not apply to fraud causes of action.  "In California, fraud must be pled specifically; general and conclusory allegations do not suffice." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645.)  This requirement serves two purposes.  First, it gives the defendant notice of the definite charges to be met.  Second, the allegations "should be sufficiently specific that the court can weed out nonmeritorious actions on the basis of the pleadings.  Thus the pleading should be sufficient ' "to enable the court to determine whether, on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud.' " " (*Committee on Children's Television, Inc. v. General Goods Corp.* (1983) 35 Cal.3d 197, 216-217, superseded by statute on another issue.)

**B.** *The Adequacy of the Fraud Allegations*

Heritage argues that it adequately alleged that WMC assigned its fraud claims against Monroy to it.  The trial court's insistence that it had to attach a document establishing the assignment shows, according to Heritage, that the court improperly considered the sufficiency of the evidence when ruling on the demurrer.  For the reasons discussed below, we disagree with Heritage's contention.

Heritage cites various allegations in its SAC where it asserted in a conclusory fashion that WMC assigned to Heritage its tort claims when WMC transferred to Heritage its rights under Monroy's promissory note.  In particular it cites its allegations that WMC "sold the loan and assigned any and all rights WMC may have including but

not limited to any right to fraud claim" against Monroy.  It further alleged that this assignment was "evidenced by signature and stamp of the secretary of WMC" on the last page of the note.  Heritage set forth in its SAC that as the assignee of WMC, Heritage "obtained all rights, title and interest in and to the mortgage loan by defendant[,]" including WMC's tort claim.  Heritage claimed that the assignment of tort claims was implied by the following language in the agreement between Heritage and WMC:  " 'Seller does hereby sell, assign and convey to Buyer, its successors and assigns, all right, title and interest in the loan.'  The loan sell agreement also provided that 'the Seller transfers assign, set-over, quitclaim and convey to Buyer all rights, title and interest of the Seller in the mortgage loan.' "  The SAC added that WMC acknowledged on May 9, 2011, that it assigned to Heritage its tort claims.

Heritage contends that its SAC also alleged assignment of the tort claims based on implied conduct of the parties, as follows:  "The assignment of the tort claim is also implied by conduct of the parties in the secondary mortgage market as it is custom and practice in the mortgage industry to assign any and all rights and interests including any right to tort claim against the borrower when selling mortgage loan.  [Heritage] alleges that based on the conduct of the parties and the language included in the buy sell agreement of the loan, and the custom and practice of lenders such as WMC, the assignment of [Monroy's] loan by WMC included assignment of any and all tort claims."

Heritage also maintains that the language in Monroy's loan implied an assignment, as Monroy acknowledged the following:  " 'Each of the undersigned specifically represents to Lender and to lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application. . . .  (6)  The Lender, its servicers,

13

successors or assigns may rely on this information contained in the application. . . .' "
(Bold omitted.)

Heritage insists that the foregoing language and the attached document, which was the written indorsement containing the signature and stamp of the secretary of WMC on the last page of the promissory note, were sufficient, and the trial court should have overruled Monroy's demurrer.

We agree that the allegations in Heritage's SAC and the attached indorsement showed an assignment of Monroy's promissory note. However, the assignment of this contract right did not carry with it a transfer of WMC's tort rights. While no particular form of assignment is required, it is essential to the assignment of a right that the assignor manifests an intention to transfer "the right." (*Sunburst Bank v. Executive Life Ins. Co., supra,* 24 Cal.App.4th at p. 1164.)

An assignment of a right generally carries with it an assignment of other rights incident thereto. (Civ. Code, § 1084.) The fraud claims based on Monroy's loan application with WMC are not "incidental to" the transfer of the promissory note to Heritage. "A suit for fraud obviously does not involve an attempt to recover on a debt or note." (*Guild Mortgage Co. v. Heller* (1987) 193 Cal.App.3d 1505, 1512; see also *Millner v. Lankershim Packing Co.* (1936) 13 Cal.App.2d 315, 319-320 [assignment of mortgage did not include assignment of right to recover for injury to the mortgaged property]; *Schauer v. Mandarin Gems of Cal., Inc.* (2005) 125 Cal.App.4th 949, 956-957 [divorce agreement awarding diamond ring purchased by husband to wife did not automatically transfer husband's claim against jeweler for fraud].) For example, in *Williams v. Galloway* (1962) 211 Cal.App.2d 302, the corporation's sale and transfer to a second corporation " '[a]ll personal property' " and all " 'property held on a leas[e]hold basis' " did not transfer a claim for money the first corporation had against its former lessor. (*Id.* at pp. 304-305.)

In the present case, the indorsement and allegations established that WMC assigned the second promissory note to Heritage. The transfer of the promissory note

14

provided Heritage with contract rights. Fraud rights are not, as a matter of law, incidental to the transfer of the promissory note.[1]

It is true that incidental rights may include certain ancillary causes of action but the assignment agreement "must describe the subject matter of the assignment with sufficient particularity to identify the rights assigned." (*Mission Valley East, Inc. v. County of Kern, supra,* 120 Cal.App.3d at p. 97.) "[A] basic tenet of California contract law dictates that when a particular right or set of rights *is* defined in an assignment, additional rights *not* similarly defined or named cannot be considered part of the rights transferred." (*DC3 Entertainment, LLC v. John Galt Entertainment, Inc.* (W.D. Wash. 2006) 412 F.Supp.2d 1125, 1144.)

Here, none of the allegations regarding assignment in the SAC specified that the assignment was transferring the ancillary right of a tort claim. The document attached by Heritage did not support any claim of an assignment by WMC to Heritage of its fraud claims against Monroy. This document was the promissory note signed by Monroy, which, on the last page, contained the signature and stamp of the secretary of WMC. Directly under "Pay to the order of" was Heritage's stamp. The transfer of the promissory note by indorsement did not show a clear intent to assign WMC's fraud claim. (See Comm. Code, § 3201 et seq.) The conveyance of the promissory note to Heritage does not establish that WMC assigned to Heritage its right to the performance of other, distinct obligations owed by Monroy, such as the obligation to provide truthful information. (See *Cambridge Co. v. City of Elsinore, supra,* 57 Cal.App. at pp. 249-250.)

Additionally, the allegations did not show an assignment of the tort claims based on custom and practice. "While no particular form of assignment is necessary, the assignment, to be effectual, must be a manifestation to another person by the owner of the right indicating his intention to transfer, without further action or manifestation of intention, the right to such other person, or to a third person. [Citation.]" (*Cockerell v. Title Ins. & Trust Co., supra,* 42 Cal.2d at p. 291.) The parties' intention is determined

---

[1] The antideficiency statutes bar any breach of contract claim by Heritage against Monroy.

15

by considering their words and acts as well as the subject matter of the contract. (*Lumsden v. Roth* (1955) 138 Cal.App.2d 172, 175.) The assignment agreement in the present case is completely silent regarding any tort claim and nothing in the agreement suggests that the assignment included any rights other than those rights incidental to the contract rights. Heritage cannot allege general custom and practice to expand the assignment agreement to include ancillary rights not specified.

Heritage claims that the decision in *National Reserve Co. v. Metropolitan Trust Co.* (1941) 17 Cal.2d 827, 833 (*National Reserve*) supports its position that WMC's tort claims were assigned with the transfer of the note. Our Supreme Court in *National Reserve* stated that an unqualified assignment of a contract vests in the assignee "all rights and remedies incidental thereto." (*Id.* at p. 833.) Heritage then proceeds to cite portions of the following quote: "If . . . an accrued cause of action cannot be asserted apart from the contract out of which it arises or is essential to a complete and adequate enforcement of the contract, it passes with an assignment of the contract as an incident thereof. Thus, the assignment of a contract passes from assignor to assignee an accrued cause of action for rescission [citations], and a creditor's assignee acquires the right to set aside a prior fraudulent conveyance by the debtor. [Citations.] As a corollary, if an assignor by express provision of a contract is denied the right to assert an accrued cause of action after he has assigned away his interest in the contract, the right to sue passes to his assignee. There would otherwise be no one to enforce the right." (*Ibid.*)

Heritage ignores the language in *National Reserve, supra,* 17 Cal.2d 827, which directly preceded the paragraph it quotes from the decision. In the preceding paragraph, the Supreme Court noted that incidental rights may "include certain ancillary causes of action arising out of the subject of the assignment and accruing before the assignment is made." (*Id.* at p. 833.) However, "[u]nless an assignment specifically or impliedly designates them, accrued causes of action arising out of an assigned contract, whether *ex contractu* or *ex delicto,* do not pass under the assignment as incidental to the contract if they can be asserted by the assignor independently of his continued ownership of the contract and are not essential to a continued enforcement of the contract." (*Ibid.*)

16

Applying the legal principles set forth in *National Reserve* to the present case, Heritage has failed to state a claim for a cause of action for fraud based on Monroy's loan application. Neither the indorsement nor the other allegations in the SAC authorize the assignment, specifically or impliedly, of WMC's tort claims. As already stressed, fraud is an ancillary cause of action to the promissory note.

Heritage maintains that it did not have to allege details and could simply allege a clear statement of the ultimate facts necessary to the cause of action. (See *Lyon v. Master Holding Corp.* (1942) 50 Cal.App.2d 238, 241.) Heritage claims that it was sufficient for it to plead the ultimate fact of ownership of the property at the time it filed this action and cites a 1924 case, *Commercial Credit Co. v. Peak* (1924) 195 Cal. 27, 32-33. This case does not help Heritage. *Commercial Credit* involved recovering the value of personal property or chattel. (*Id.* at p. 29.) This case did not involve a promissory note; it did not involve a claim based on the assignment of a tort; nor did it involve claims based on fraud. Thus, *Commercial Credit* has no application to the present case. Heritage ignores that every element of a fraud cause of action must be pleaded specifically.

Finally, Heritage complains that the trial court was assessing the veracity of the allegations in the SAC, and cites the court's order instructing it to attach a writing to show an assignment as proof that the court improperly assessed the weight of the evidence. We disagree with Heritage's conclusion.

"A written contract may be pleaded either by its terms—set out verbatim in the complaint or a copy of the contract attached to the complaint and incorporated therein by reference—or by its legal effect. [Citation.] In order to plead a contract by its legal effect, plaintiff must 'allege the substance of its relevant terms. This is more difficult, for it requires a careful analysis of the instrument, comprehensiveness in statement, and avoidance of legal conclusions.' [Citation.]" (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1489.) Since the allegations in Heritage's pleadings did not set forth with specificity any assignment of the tort claims, the trial court properly instructed Heritage to attach the written agreement that evinced an intent to assign the tort claims.

17

Accordingly, we conclude that the trial court did not err when it found that Heritage failed to state causes of action for fraud based on assignment.**2**

## C. *Denying Heritage Leave to Amend its SAC*

Heritage contends that the trial court abused its discretion when it did not permit it to amend its SAC.

The court abuses its discretion in sustaining the demurrer without leave to amend if the plaintiff can show a reasonable possibility of curing the defect in the complaint by amendment. (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318.) Heritage has the burden of proving that an amendment would cure the defect. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)

In support of its argument that it should have been permitted to amend its pleading a third time, Heritage argues that its SAC was sufficient and that it could have amended the pleading to indicate that WMC intended to transfer its tort rights to Heritage. In the trial court, Heritage attached a declaration of Taylor, a representative for WMC Mortgage, LLC. Taylor's declaration dated August 24, 2011, stated: "As Assistant Secretary, I am authorized to speak on behalf of WMC Mortgage, LLC, successor to WMC . . . ." She confirmed that WMC relied on the information provided by the borrower applying for a loan to determine the borrower's "eligibility for the products offered." She declared: "When WMC sold its mortgage loans to third parties, WMC assigned *all* of its legal rights (in tort as well as contract), as the originating lender, to the

---

**2** Monroy also argues that the antideficiency statutes barred Heritage's claims and that the fraud claim could not be assigned. Heritage argues, among other things, that the antideficiency statutes do not preclude an action against a borrower for fraud in the inducement of a loan. (See, e.g., *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1237-1238; see Code of Civ. Proc., § 726, subd. (f)).

The trial court did set forth a second, independent basis for its ruling. Since the promissory note was assigned after foreclosure of the first deed of trust, the trial court stated that the second deed of trust securing the promissory note had been extinguished and "there was no underlying property interest supporting an incidental assignment of the original lender's fraud claims." We need not address this independent ground for sustaining the demurrer without leave to amend.

buyer—including, but not limited to, the right to recover against a borrower for fraud."
(Underline omitted.)

Taylor's declaration on August 24, 2011, more than two years after Heritage acquired Monroy's unpaid note as part of a "larger pool of loans," does not shed any light on the parties' intent at the time of the assignment. The assignment agreement contains absolutely no language indicating that WMC intended to transfer any rights ancillary to the right to collect on the promissory note. Contract "rights" do not exist as disembodied abstractions apart from a contract that created them. More precisely, in California, "the intention of the parties as expressed in the contract is the source of contractual rights and duties." (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 38.) Thus, we assess the intent at the time the agreement is formed, not years later.

The trial court provided Heritage with ample opportunity to cure the defect in its pleading; Heritage failed to demonstrate it could cure the defect. The trial court thus did not abuse its discretion in sustaining the third demurrer against Heritage's pleading without leave to amend.

## II. *The Grant of Summary Adjudication on Monroy's Cross-Complaint*
### A. *The Trial Court's Ruling*

Monroy alleged violations of the Rosenthal Act and the FDCPA in her cross-complaint. She claimed that Heritage violated the FDCPA by attempting to collect a debt not owed, by using unconscionable, false, deceptive, and/or misleading means to seek to collect a debt, and by threatening legal actions that could not be legally taken.

Monroy moved for summary adjudication on her claims and the trial court denied the motion as to her claim of violating the Rosenthal Act. It granted her motion as to her claim that Heritage violated the FDCPA, and awarded Monroy damages in the amount of one dollar. The court found that Heritage's conduct in threatening Monroy with the prosecution of legal claims that had no merit violated the FDCPA.[3]

---

[3] Heritage has forfeited any argument that the trial court should have granted its request for a continuance to permit it to conduct additional discovery because it did not raise this argument in its opening brief. (See, e.g., *People v. Stanley* (1995) 10 Cal.4th

**B.** *Standard of Review*

To prevail on a summary adjudication motion, a cross-complainant must prove "each element of the cause of action entitling the party to judgment on that cause of action. . . ." (Code Civ. Proc., § 437c, subd. (p)(1).) Only if the cross-complainant satisfies this burden will the burden shift to the cross-defendant "to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (*Ibid.*) The cross-defendant "may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto." (*Ibid.*)

"In reviewing whether these burdens have been met, we strictly scrutinize the moving party's papers and construe all facts and resolve all doubts in favor of the party opposing the motion. [Citations.]" (*Innovative Business Partnerships, Inc. v. Inland Counties Regional Center, Inc.* (2011) 194 Cal.App.4th 623, 628.) On appeal, the trial court's ruling is examined under a de novo standard of review. (*Brinton v. Bankers Pension Services, Inc.* (1999) 76 Cal.App.4th 550, 555.)

**C.** *The FDCPA*

The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." (15 U.S.C. § 1692(e).) "A basic tenet of the Act is that all consumers, even those who have mismanaged their financial affairs resulting in default on their debt, deserve 'the right to be treated in a reasonable and civil manner.' " (*Bass v. Stopler, Koritzinsky, Brewster & Neider, S.C.* (7th Cir. 1997) 111 F.3d 1322, 1324 (*Bass*).) Since the FDCPA is a remedial statute, "it should be construed liberally in favor of the consumer." (See, e.g., *Johnson v. Riddle* (10th Cir. 2002) 305 F.3d 1107, 1117.)

---

764, 793 [if no legal argument with citation to authority " 'is furnished on a particular point, the court may treat it as waived, and pass it without consideration' "].)

20

The word " 'creditor' means any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another." (15 U.S.C. § 1692a(4).) "The term 'debt' means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." (15 U.S.C. § 1692a(5).)

The FDCPA defines " 'debt collector' " as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. . . . [T]he term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. . . ." (15 U.S.C. § 1692a(6).)

Under the FDCPA, "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." (15 U.S.C. § 1692e.) A violation of this section includes "[t]he false representation of" "the character, amount, or legal status of any debt[.]" (15 U.S.C. § 1692e(2)(A).) A violation also includes "[t]he threat to take any action that cannot legally be taken . . . ." (15 U.S.C. § 1692e(5).) Additionally, a violation occurs if the debt collector uses "any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer" (15 U.S.C. § 1692e(10)) or makes "[t]he false representation or implication that accounts have been turned over to innocent purchasers for value" (15 U.S.C. § 1692e(12)).

State courts have concurrent jurisdiction over claims under the FDCPA. (15 U.S.C. § 1692k(d).) The FDCPA will not impose any liability "to any act done or omitted in good faith in conformity with any advisory opinion of the Bureau, notwithstanding that after such act or omission has occurred, such opinion is amended,

21

rescinded, or determined by judicial or other authority to be invalid for any reason." (15 U.S.C. § 1692k(e).)

## D. *Heritage Violated the FDCPA*

When alleging a claim under the FDCPA, a plaintiff must establish that (1) the plaintiff is a consumer, as defined by the FDCPA; (2) the debt arises out of a transaction primarily for personal, family or household purposes; (3) the defendant is a debt collector, as that phrase is defined by the FDCPA; and (4) the defendant violated a provision of the Act. (15 U.S.C. § 1692e; *Heintz v. Jenkins* (1995) 514 U.S. 291, 294; *Wallace v. Washington Mut. Bank, F.A.* (6th Cir. 2012) 683 F.3d 323, 326.)

Monroy's claim was based on the collection letter dated May 25, 2010, sent to her by Heritage. She received the letter on June 28, 2010, and it was attached to the summons and complaint against her. The letter advised that Heritage had commenced a civil action against Monroy and admonished her that "any misinformation or misrepresentations provided in the [loan] application are a violation of federal law and may result in 'civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation' for which Heritage . . . currently seeks." The letter warned that if Heritage was unable to resolve the matter by the date Monroy's answer was due, Heritage would "have no other option but to proceed with litigation against" her. The letter declared that it was "from a debt collector" and was "an attempt to collect a debt." In the trial court, in Heritage's separate statement of disputed facts in support of its opposition to Monroy's motion for summary adjudication, Heritage admitted that it was a debt collector and that it was attempting to collect an alleged debt against Monroy.

Thus, the undisputed facts established that Heritage was a debt collector and attempting to collect a debt from Monroy. Monroy's obligation was to pay for "personal, family, or household purposes" (15 U.S.C. § 1692a(5)), as this was a debt incurred to purchase a home in which, according to Monroy's declaration, she intended to live. There was evidence that a Manteca property was also purchased in Monroy's name, but there is no evidence that she ever lived in that home or intended to live in that home.

22

Indeed, the unchallenged evidence was that Monroy was the victim of identity theft and that she did not know anything about the Manteca property. Monroy stated that she lived at the Richmond property and Heritage presented no evidence that she resided at another location.

The evidence also supported a finding that the letter Heritage sent to Monroy violated the FDCPA. The letter attached to the complaint and summons threatened Monroy with a lawsuit for any misinformation she provided on her loan application with WMC. Heritage asserted that Monroy owed it the money for any fraud on her application because it was now the owner of the promissory note. As discussed extensively above, Heritage's claims based on fraud had no merit. Thus, Heritage violated the FDCPA when it indicated in the letter that it had the right to sue Monroy for any misinformation submitted on the promissory note and when it attempted to induce her to settle with Heritage.

Additionally, according to Ben Ganter, the director of client relations for Heritage, Heritage acquired Monroy's unpaid note as part of a larger pool of loans that included both secured and unsecured mortgage loans. He acknowledged that Heritage then "seeks to collect on the unpaid balances of the notes it purchased" and that "Heritage's business model is collecting on the loans it purchases." Heritage purchased Monroy's junior loan without any knowledge about the accuracy of the loan application. Before Heritage discovered the alleged fraud, it sent Monroy letters telling her that she was obligated to pay Heritage "for the unpaid balance of the note . . . ." According to Ganter, a third notice of Monroy's obligation to pay [Heritage] for the unpaid balance on the Note was sent via postal mail in December of 2009. These notices clearly violated the FDCPA because, as the trial court found, Heritage had made a binding judicial admission that it received the assignment of Monroy's note after the foreclosure of the first deed of trust, and that event extinguished the second deed of trust securing Monroy's note under the antideficiency statutes (see Code Civ. Proc., § 580b).

Heritage complains that Monroy alleged that the complaint sent to her attached to the letter violated the FDCPA and a legal action is not a communication covered by the

23

FDCPA. We need not address this argument because Monroy's claim was not based on a communication under the FDCPA, but based on the debt collector's using "false, deceptive, or misleading representation or means in connection with the collection of any debt." (15 U.S.C. § 1692e.)

Heritage also argues that "debt," as defined by the FDCPA, does not include tort claims. As already noted, Heritage also violated the FDCPA when it sent a notice demanding payment on the money owed on the promissory note when that debt had been extinguished under the antideficiency statutes. Furthermore, we disagree with Heritage's argument that tort claims are never debts under the FDCPA.

In support of its argument that a "debt" does not include a tort claim, Heritage cites various cases that have held that any obligation to pay damages arising from a tort claim, court judgment, or criminal activity does not constitute a debt under the FDCPA. (See, e.g., *Fleming v. Pickard* (9th Cir. 2009) 581 F.3d 922, 925-926 [cause of action for tortious conversion is not a debt under the FDCPA]; *Turner v. Cook* (9th Cir. 2004) 362 F.3d 1219, 1227 [tort judgment resulting from business-related conduct not a debt under the FDCPA because " 'when we speak of 'transactions,' we refer to consensual or contractual arrangements, not damage obligations thrust upon one as a result of no more than her own negligence' "]; *Hawthorne v. Mac Adjustment, Inc.* (11th Cir. 1998) 140 F.3d 1367, 1371 [holding that the obligation to pay arose from a tort, and not from a consumer transaction, and therefore was not a debt under the FDCPA]; *Zimmerman v. HBO Affiliate Group* (3d Cir. 1987) 834 F.2d 1163, 1167-1169.)

In the cases cited by Heritage, the obligations to pay were created by something other than a consumer transaction and were not consensual. (See, e.g., *Fleming v. Pickard, supra,* 581 F.3d at p. 925 [" 'at a minimum, a "transaction" under the FDCPA must involve some kind of business dealing or other consensual obligation' "].) Thus, we agree that courts have consistently excluded tort obligations or criminal activity from the FDCPA's definition of "debt" *when* the tort obligations do not arise out of a consensual transaction. In *Zimmerman v. HBO Affiliate Group, supra,* 834 F.2d 1163, for example, the Third Circuit held that the FDCPA did not apply to attempts by cable television

24

companies to collect money from people who allegedly had stolen cable television signals by installing illegal antennas. (*Zimmerman,* at pp. 1167-1169.) There was no FDCPA "debt" in *Zimmerman* because the obligations arose out of a theft rather than a transaction. Neither the complaint nor the demand letter included any assertion of an offer of extension of credit and therefore no transaction had occurred. (*Zimmerman*, at pp. 1167-1169.)

As already stressed, a debt or obligation under the FDCPA must be based on a consumer consensual or contractual arrangement, not a damage obligation. (See, e.g., *Hawthorne v. Mac Adjustment, Inc., supra,* 140 F.3d at p. 1372). Unlike the cases upon which Heritage relies, the present case is not a situation in which Monroy never had a contractual arrangement of any kind with WMC. Rather, Monroy's alleged debt to Heritage arose out of her transaction with WMC to purchase the Richmond property. The alleged fraud claims clearly arose out of a residential mortgage transaction and Heritage cannot avoid the application of the FDCPA simply because it alleged in its pleading that Monroy's obligation to it was based on the misrepresentations she made on her loan application rather than on a breach of her obligations under the contract.

Heritage declares that the present case is similar to *Turner v. Cook, supra,* 362 F.3d 1219, but *Turner* is clearly distinguishable from the present case. In *Turner,* the appellees obtained a judgment against Stephen Turner and "the judgment arose from allegations of various business interference torts" by Turner against the appellees. (*Id.* at pp. 1222-1223.) Subsequently, the appellees filed a claim that Turner fraudulently conveyed his real and personal property to prevent the appellees from collecting on the judgment. (*Id.* at p. 1223.) Turner claimed that the appellees violated the FDCPA when attempting to collect the judgment. (*Turner,* at pp. 1223-1224.) When rejecting the claim under FDCPA, the Ninth Circuit held that a tort judgment is not a debt under the FDCPA. (*Turner,* at p. 1227.) Turner had admitted that the judgment was based on alleged business interference torts, not any consumer transaction, and it was immaterial that the fraudulent conveyance action involved Turner's home. (*Id.* at p. 1228.)

25

In *Turner v. Cook, supra,* 362 F.3d 1219, the liability arose from tortious activity, not from a consensual transaction. By contrast, here, Monroy and WMC entered into a consensual loan agreement for the purchase of a residential home.

Heritage argues that the present liability did not arise out of a consensual transaction because WMC did not consent to mortgage fraud. Heritage maintains that the present transaction is the same as the theft of goods or services.

Heritage's argument is contrary to the court decisions that have held that there is no automatic fraud exception to the FDCPA. (See, e.g., *F.T.C. v. Check Investors, Inc.* (3d Cir. 2007) 502 F.3d 159, 170; *Keele v. Wexler* (7th Cir. 1998) 149 F.3d 589, 595.) " 'Absent an explicit showing that Congress intended a fraud exception to the Act, the wrong occasioned by debtor fraud is more appropriately redressed under the statutory and common law remedies already in place, not by a judicially-created exception that selectively gives a green light to the very abuses proscribed by the Act.' " (*F.T.C.*, at p. 170.)

The breadth of the phrase "any obligation or alleged obligation" is not limited to a particular set of obligations. (*Bass, supra,* 111 F.3d at p. 1325.) Thus, a replevin action, even though it is a tort claim, may be a debt under the FDCPA. (*Rawlinson v. Law Office of William M. Rudow, LLC* (4th Cir. 2012) 460 Fed.Appx. 254, 257.) "[A] court should look beyond the label of the debt collection practice to determine whether a 'debt' is being collected." (*Ibid.*)

Here, WMC and Monroy consented to the loan application. The fraud action, even though it is a tort claim, arose from the consensual loan transaction, and thus it is a debt under the FDCPA.

**E.** *No Defense to the Application of the FDCPA*

Heritage contends that it has a defense, as a matter of law, to the application of the FDCPA. It claims that it relied on an advisory opinion by the Federal Trade Commission (FTC) that collecting on tort damages is not a debt for purposes of the FDCPA.

The FDCPA provides an affirmative defense for " 'any act done or omitted in good faith in conformity with any [FTC] advisory opinion' . . . ." (*Jerman v. Carlisle,*

26

*McNellie, Rini, Kramer & Ulrich LPA* (2010) 599 U.S. 573, ___ [130 S.Ct. 1605, 1607] (*Jerman*), quoting 15 U.S.C. § 1692k(e).)  However, "ignorance of the law will not excuse any person, either civilly or criminally."  (*Jerman,* at p. ___ [p. 1611].)

The "advisory opinion" relied upon by Heritage is a letter dated August 27, 1992, written to an attorney in Florida.[4]  The attorney wished to know if the claim for civil damages against an alleged shoplifting offender would be covered under the FDCPA. The letter stated that these torts would not be debts as defined in the FDCPA and admonished that "[t]he views expressed herin represent an informal staff opinion.  As such, they are not binding on the [FTC]. . . ."

This letter is an "informal staff opinion" and not an advisory opinion. Furthermore, the claim of damages arising from a theft, as was the subject of the FTC's letter, is clearly distinguishable from the present case.  As already discussed, Heritage was not collecting on tort damages, but on a claim of fraud arising out of a loan contract.

Courts held as early as 1998 that there is no automatic fraud exception to the FDCPA.  (*Keele v. Wexler, supra,* 149 F.3d at p. 595 ["neither the text nor underlying legislative history of the FDCPA lends itself to the recognition of a fraud exception"].) Heritage's ignorance of the law does not provide it with an affirmative defense to the application of the FDCPA.

**F.  *No Triable Issue of Fact***

Heritage argues that the trial court should not have granted the summary adjudication motion because there was a triable issue of fact as to whether the tort claims had been assigned.  It complains that the court refused to consider its evidence of assignment.

In support of this argument, Heritage cites *Cadlerock Joint Venture, L.P. v. Lobel* (2012) 206 Cal.App.4th 1531 (*Cadlerock*).  In *Cadlerock,* a single lender provided a

---

[4]  We note that Heritage does not even make any particular citation to the "advisory opinion" but simply asserts that "[t]he FTC issued an advisory opinion stating that collecting on tort damages is not a debt for purposes of the FDCPA in a letter to James R. Palmer."

borrower with two non-purchase money loans secured by two deeds of trust against the same real property, and then assigned the junior loan to a third party. (*Id.* at p. 1536.) The court held that the assignee of the junior loan was not precluded from seeking a deficiency judgment against the borrower after the senior loan was extinguished by a foreclosure sale of the property. (*Id.* at pp. 1546-1547.) The court stressed that the junior loan had been assigned prior to the foreclosure sale. (*Ibid.*) In *Cadelrock*, the antideficiency statute did not preclude the assignee of the junior loan from seeking a deficiency judgment after the extinguishment of the senior loan, held by a different entity, because there was no evidence that the lender created two loans "as an artifice to evade" Code of Civil Procedure section 580d. (*Cadlerock,* at p. 1547.)

Cadlerock* has no applicability to the present case. Unlike the situation in *Cadlerock,* Monroy's loans were purchase money loans and the antideficiency statutes applied to both her senior and junior loans under Code of Civil Procedure section 580b. Furthermore, the junior loan was assigned to Heritage *after* the foreclosure. Critical to the holding in *Cadlerock* was the fact that the junior loan had been assigned prior to the trustee's sale. (*Cadlerock, supra,* 206 Cal.App.4th at pp. 1546-1547.)

Here, the undisputed facts establish that Monroy's loans were covered by the antideficiency statutes and that the junior loan was assigned to Heritage after the foreclosure on the senior loan. Thus, there was no triable issue of fact that Heritage could seek payment for breach of the promissory note. Furthermore, as already discussed, Heritage has failed to identify any evidence that raised a triable issue of material fact as to its argument that the assignment agreement included WMC's potential tort claims against Monroy. Accordingly, we conclude the trial court did not err in granting Monroy's motion for summary adjudication on her claim that Heritage violated the FDCPA.

### III. *Attorney Fees*

### A. *Fees Awarded and the Standard of Review*

The trial court found that Monroy was the prevailing party and entitled to attorney fees under the FDCPA. (15 U.S.C. § 1692k(a)(3).) The court awarded Monroy attorney

fees in the amount of $450 an hour for 194.5 hours for the lodestar amount of $87,525. The court also awarded Monroy litigation expenses in the amount of 1,964.60.

"Unless authorized by either statute or agreement, attorney's fees ordinarily are not recoverable as costs. [Citations.]" (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 127-128.) The FDCPA provides for attorney fees to be awarded to the prevailing party. (15 U.S.C. § 1692k(a)(3).) "Courts have discretion in calculating reasonable attorney's fees under this statute" (*Jerman, supra,* 599 U.S. at p. ___ [130 S.Ct. at p. 1621]), but the award of at least some modicum of attorney's fees is mandatory under the FDCPA when the defendant is found to have violated the Act because "congress chose a 'private attorney general' approach to assume enforcement of the FDCPA" (*Camacho v. Bridgeport Financial, Inc.* (9th Cir. 2008) 523 F.3d 973, 978).

" 'On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees . . . have been satisfied amounts to statutory construction and a question of law.' " (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.)

Any challenge based on the amount of the fee awarded is reviewed for an abuse of discretion. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 (*PLCM Group*) ["the trial court has broad authority to determine the amount of a reasonable fee"].) An appellate court will interfere with the trial court's determination of the amount of reasonable attorney fees only where there has been a manifest abuse of discretion. (*Fed-Mart Corp. v. Pell Enterprises, Inc.* (1980) 111 Cal.App.3d 215, 228.) " 'The "experienced trial judge is the best judge of the value of professional services rendered in [the] court, and while [the judge's] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong" '—meaning that [the trial judge] abused [his or her] discretion." (*PLCM Group,* at p. 1095.)

"[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate. 'California courts have consistently held that a computation of time spent on a case and

the reasonable value of that time is fundamental to a determination of an appropriate attorneys' fee award.' [Citation.] The reasonable hourly rate is that prevailing in the community for similar work. [Citations.] The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided. [Citation.] Such an approach anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary. [Citation.]" (*PLCM Group, supra,* 22 Cal.4th at p. 1095.)

**B.** *The Degree of Success*

Heritage contends that the trial court did not apply the proper standard of law, and then argues that the attorney fee award was excessive because the trial court did not reduce the award on the basis that Monroy's success was limited. The decision whether to reduce an award because of a determination that the party enjoyed limited success is not reviewed de novo, as Heritage argues, but for an abuse of discretion.

The United States Supreme Court has held that the level of a party's success is relevant to the amount of the fees to be awarded, and fees should not be awarded for the work on an unsuccessful claim. (*Hensley v. Eckerhart* (1983) 461 U.S. 424, 434-435.) The court in *Hensley* did not discuss the FDCPA, but addressed a nearly identical fee shifting statute applicable to civil rights litigation (42 U.S.C. § 1988). The court recognized that "unrelated claims [may be] unlikely to arise with great frequency" because the case may present a single claim or the claims "will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained" in relation to the hours reasonably expended on the litigation. (*Hensley,* at p. 435.)

"If . . . a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate *may* be an excessive amount. This will be true even where the plaintiff's claims were

30

interrelated, nonfrivolous, and raised in good faith. . . . [T]he most critical factor is the degree of success obtained." (*Hensley v. Eckerhart, supra,* 461 U.S. at p. 436, italics added.) To be compensable, an attorney's time must be "reasonable in relation to the success achieved." (*Ibid.*)

Here, Heritage argues that Monroy's attorney fees are unreasonably large in comparison to Monroy's recovery of $1.00. It also maintains that Monroy admitted at her deposition that she did not know what the case was about and, thus, according to Heritage, she had no stake in this action. Heritage complains that the trial court failed to take into consideration the limited amount of success achieved and asserts that its violation of the FDCPA was only a technicality as Monroy could not show any damages.

In support of this argument, Heritage cites federal and California cases involving attorney fees in non-FDCPA cases. (*Farrar v. Hobby* (1992) 506 U.S. 103; *Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989; *Environmental Protection Information Center v. Department of Forestry & Fire Protection* (2010) 190 Cal.App.4th 217, 238; *Sokolow v. County of San Mateo* (1989) 213 Cal.App.3d 231, 249.) These cases stress that the degree or extent of the plaintiff's success must be considered when determining reasonable attorney fees. For example, in *Farrar,* the plaintiff filed a lawsuit alleging a violation of his civil rights under title 42 of the United States Code section 1983 and demanded $17 million from six defendants and, after 10 years of litigation and two trips to the Court of Appeals, he received one dollar from one defendant. (*Farrar,* at p. 107.) The United States Supreme Court held that attorney fees should not be awarded because a technical vindication of one's constitutional rights alone was not enough to justify an award of attorney fees under section 1988. (*Farrar,* at p. 115.) The award of only nominal damages highlighted the plaintiff's failure to prove actual injury or any basis for awarding punitive damages. (*Ibid*.)

Courts have applied the reasoning of *Farrar v. Hobby, supra,* 506 U.S. 103 to FDCPA cases. (See, e.g., *Zagorski v. Midwest Billing Services, Inc.* (7th Cir. 1997) 128 F.3d 1164, 1166 [remanding to the district court to determine reasonable attorney fees in a FDCPA case and instructing the court to use as a guide the methodology "traditionally

employed in determining appropriate fees" under title 42 United States Code section 1988]; *Johnson v. Eaton* (5th Cir. 1996) 80 F.3d 148, 151 [plaintiff awarded no actual or statutory damages and the mere technical violation of the FDCPA was not sufficient to support an award of attorney fees]; *Tolentino v. Friedman* (7th Cir. 1995) 46 F.3d 645, 651.)  Although courts when awarding attorney fees in FDCPA cases have followed *Farrar* by considering limited or partial success, these same courts have generally been reluctant to reduce fee awards on the basis of a low monetary recovery since FDCPA statutory damages are capped at $1,000, and a $1,000 recovery doe not render a plaintiff's success "limited."  (See, e.g., *Defenbaugh v. JBC & Associates, Inc.* (N.D. Cal. Aug. 10, 2004, No. C-03-0651 JCS) 2004 WL 1874978.)  Congress created an incentive for attorneys to represent plaintiffs in FDCPA cases by providing for fee shifting, and a requirement of proportionality between attorney fees and damages would discourage attorneys from accepting representation of FDCPA plaintiffs; this would be inconsistent with the FDCPA's statutory scheme.  (See, e.g., *Phenow v. Johnson, Rodenberg & Lauinger, PLLP* (D.Minn. 2011) 766 F.Supp.2d 955, 959.)  The fees should be adequate to attract competent counsel, but they should not be "so large that it is a windfall for attorneys—who should not be encouraged to grow fat off of lackluster cases, or pester the court with trifles in the hopes of capturing large attorneys' fees from dubious claims." (*Obenauf v. Frontier Financial Group, Inc.* (D.N.M. 2011) 785 F.Supp.2d 1188, 1214.)

Here, Monroy alleged violations of the FDCPA and the Rosenthal Act and did not allege actual damages, but requested the maximum statutory damages of $1,000 under each statute for a total statutory award of $2,000.  Her sole complaint was that Heritage had engaged in an unlawful collections effort, which was evinced by the collection letters and the lawsuit against her.  Monroy was completely successful in establishing the unlawfulness of Heritage's behavior.  Monroy agreed to a nominal damage award to avoid the costs of litigation, but she was still the prevailing party.  A plaintiff who wins a nominal amount of statutory damages has brought a "successful action" under the FDCPA.  (See *Thornton v. Wolpoff & Abramson, LLP* (11th Cir. 2008) 312 Fed.Appx. 161, 164.)

Under the FDCPA, the court in awarding damages is to consider "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional . . . ." (15 U.S.C. § 1692k(b)(1).) Here, the trial court recognized that Heritage wrote a number of letters to Monroy that violated the FDCPA. The court considered that Monroy did not seek to add unnecessary legal fees by insisting on litigating the damages. It also considered that she did not initiate the lawsuit against Heritage, but filed a counterclaim in response to Heritage's attempts to force her to pay money that she did not owe.

Lastly, while the award here was nominal, that is not necessarily controlling because "an award of nominal damages can represent a victory in the sense of vindicating rights even though no actual damages are proved." (*Farrar v. Hobby, supra,* 506 U.S. at p. 121, O'Connor, J., concurring.) Success may be measured by "the significance of the legal issues on which the plaintiff prevailed and the public purpose the litigation served." (*Morales v. City of San Rafael* (9th Cir. 1996) 96 F.3d 359, 365.) This lawsuit may spur Heritage to cease unlawful conduct against other consumers, which is an important consideration.

We thus conclude that the trial court did not abuse its discretion in not reducing the attorney fee award based on an argument that Monroy achieved limited success.

## C. *The Number of Hours Expended*

Heritage objects to the amount of the fee charged by Peter B. Fredman, counsel for Monroy, and asserts that the calculation included hours for work not reasonably expended in pursuit of Monroy's successful claim. (See, e.g., *Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 424 [appellate court determined trial court properly deleted hours spent on unsuccessful petition for rehearing of a prior appeal].) Specifically, Heritage objects to the following: 2.4 hours spent by Fredman on March 25, 2011, for attending to a letter from Heritage that threatened Fredman with a libel suit; .06 of an hour spent on April 21 and 22, 2011, for drafting a declaration in support of a motion in a different superior court class action lawsuit where Heritage was a party; 9.6 hours for attending to matters regarding the class action case and/or

33

conferring with class counsel; 7.9 hours for communicating with another attorney regarding a demurrer hearing;[5] .02 of an hour on May 31, 2011, for reviewing investigation material of a defendant in another case involving Heritage; .08 of an hour on July 25, 2011, for a conference with another person involving Heritage in Bankruptcy Court; and 3.2 hours for an appearance at a summary judgment hearing when Fredman missed the hearing but made an appearance later to deliver a proposed order. Heritage claims that awarding fees for the foregoing, which equals 23.26 hours, was an abuse of discretion.

At the hearing on attorney fees, counsel for Heritage made a number of specific complaints about the reasonableness of the hours billed. For example, Heritage argued that Fredman billed his client .6 hours for preparing a declaration for another action; Heritage also objected to billing for work allegedly done on other cases unrelated to the present action. The trial court responded that it did not see "any of this in any of your papers." Counsel for Heritage answered that it was in its opposition. The court commented that it would have to take another look, but instructed counsel to proceed with argument. At the end of the hearing, the court affirmed its tentative ruling. Heritage maintains that the court made its ruling without reviewing its papers as promised and therefore it clearly abused its discretion.

The record indicates that the trial court reasonably exercised its discretion in determining the number of hours spent on the lawsuit. The trial court considered Heritage's argument that the abovementioned charges were unreasonable. The court listened to argument and obviously concluded that the argument by Heritage's counsel lacked merit and that it was unnecessary to read through the opposition papers again to determine if each specific objection had actually been raised in Heritage's opposition.

The trial court stated, "As the judge in this case, I did go over the billings and I didn't see anything that I could say was unreasonable for hours spent on certain tasks."

---

[5] This attorney specially appeared on behalf of Monroy at the third demurrer hearing on August 9, 2011, because Fredman was on vacation in Michigan. These hours included the hours billed by the attorney for the work completed and the appearance.

34

Thus, the court specifically stated that it found the hours worked by Monroy's attorney to have been reasonably spent, and rejected Heritage's argument that approximately 24 hours were unreasonably spent. The trial court had a reasonable basis for making this determination in light of the detailed timekeeping records and supporting declarations provided by Fredman. Heritage has failed to demonstrate that the court's finding that these hours were reasonably expended in pursuit of Monroy's claim exceed the bounds of reason. (See, e.g., *Maughan v. Google Technology, Inc.* (2006) 143 Cal.App.4th 1242, 1250.)

**D. *The Reasonable Hourly Rate***

Heritage contends that the hourly rate of $450, which the trial court awarded Fredman, was unreasonable.

In determining hourly rates, the court must look to the "prevailing market rates in the relevant community." (*Bell v. Clackamas County* (9th Cir. 2003) 341 F.3d 858, 868.) The rates of comparable attorneys in the forum district are usually used. (See *Gates v. Deukmejian* (9th Cir. 1992) 987 F.2d 1392, 1405.) In making its calculation, the court should also consider the experience, skill, and reputation of the attorney requesting fees. (*Schwarz v. Secretary of Health & Human Services* (9th Cir. 1995) 73 F.3d 895, 906.) The court may rely on its own knowledge and familiarity with the legal market in setting a reasonable hourly rate. (*Ingram v. Oroudjian* (9th Cir. 2011) 647 F.3d 925, 928.) "Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate." (*United Steelworkers of America v. Phelps Dodge Corp.* (9th Cir. 1990) 896 F.2d 403, 407.)

Here, Fredman declared that he had 15 years of experience and his "old" hourly rate was $450 per hour. (He declared that his rate had increased to $500-$525 per hour.) He noted that this rate had been approved for his work in a class action settlement in the superior courts and federal court. He added that this hourly rate did not include a contingency risk. Fredman also attached the declaration of Attorney Richard Pearl. Pearl summarized the hourly rates charged by various law firms for comparable services.

According to his analysis, fees awarded in class actions cases in 2012, for 12-15 years of experience, varied from $455 to $610 per hour.

The trial court concluded that counsel's hourly fee rate of $450 was "within acceptable parameters for attorneys of counsel's skill and experience practice in the San Francisco Bay area" and it denied the enhancement Fredman requested. The court added: "Whether it's this kind of case or any other kind of case, I know that is a fee that is charged in the community. I can't say that it's unreasonable."

Heritage claims that the trial court abused its discretion in accepting the hourly rate of $450 because it did not consider similar work in the community that was equally complex. It argues that the attorney fees discussed by Pearl in his declaration were not applicable because they were class action cases and more complex than the present case. Heritage also distinguishes the cases cited by Fredman where the courts awarded him his hourly rate of $450 as being complex class action cases that did not allege a violation of the FDCPA. Heritage cites a 2007 federal case where the billing rate in a FDCPA case was reduced to $250. (*Navarro v. Eskanos & Adler* (N.D. Cal. Nov. 26, 2007, No. C 02-03430 WHA) 2007 WL 4200171 (*Navarro*), vacated by *Navarro v. Eskanos & Adler* (N.D. Cal. Dec. 11, 2007, No. C 06-2231 WHA) 2007 WL 448306.)

We do not find Heritage's argument to be persuasive. The attorney fees awarded in *Navarro,* a 2007 federal case where the legal work was completed in 2006, have little relevance to the hourly rate of fees for legal work done in 2010 through 2012. Monroy's counsel submitted evidence supporting his hourly rate and Heritage did not submit evidence of current rates contradicting this rate. Accordingly, we conclude that the trial court did not abuse its discretion when it used the hourly rate of $450.

**E. *Block Billing***

Heritage asserts that the trial court should have reduced the amount of the attorney fees requested because Fredman used block billing. In support of this argument, Heritage states that Fredman submitted records demonstrating that he billed 182.6 hours in this litigation. Heritage fails to provide any citation to the record to support this statement.

36

Heritage complains in a conclusory fashion that Fredman assigned a block of time to multiple tasks rather than itemizing the time spent on each task. It asserts that the use of block billing makes it impossible to discern the amount of time spent on each task. In support of this argument, Heritage relies on *Bell v. Vista United School Dist.* (2000) 82 Cal.App.4th 672.[6] In *Bell,* the court reversed an attorney fee award because the block billing made it impossible for the court to apportion the fees between a cause of action alleging a Brown Act violation for which statutory fees are allowed and other causes of action. (*Id.* at p. 689.) *Brown* does not suggest that block billing is never appropriate.

Trial courts retain discretion to penalize block billing when the practice prevents them from discerning which tasks are compensable and which are not. (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1324-1325; *Bell v. Vista Unified School Dist., supra,* 82 Cal.App.4th at p. 689.) The trial court identified no such problem here, and Heritage has completely failed to show that block billing occurred or that 182.6 hours billed for litigation was unreasonable.

**F.** *Apportionment*

Heritage argues that the trial court erred when it awarded attorney fees associated with the litigation in defense of the tort claims against Monroy because no statute or contract provided for fees in defense of these claims. In a separate argument, it asserts that the court should also have separated the fees associated with Monroy's unsuccessful claim of a violation of the Rosenthal Act.

In attacking the fees awarded, Heritage in its opening brief does not even mention the trial court's ruling that the issues raised by Heritage's complaint and Monroy's counter claims for violating the Rosenthal Act and the FDCPA "are synonymous and

---

[6] Heritage also argues that the California State Bar's Committee on Mandatory Fee Arbitration does not distinguish between apportioned and non-apportioned cases and the Bar opined that block billing hides accountability. Heritage seems to be suggesting that we should take this statement of the State Bar as law and ignore the consistent precedent in California cases that provide trial courts with the *discretion* about whether to penalize block billing. The State Bar's comment about block billing in fee arbitrations is not binding on state courts.

interrelated and cannot reasonably be separated." Noticeably absent from Heritage's briefs in this court is any discussion of the substantial authority supporting a trial court's decision not to apportion fees when all of the claims are interrelated.

"When a cause of action for which attorney fees are provided by statute is joined with other causes of action for which attorney fees are not permitted, the prevailing party may recover only on the statutory cause of action. However, the joinder of causes of action should not dilute the right to attorney fees. Such fees need not be apportioned when incurred for representation of an issue common to both a cause of action for which fees are permitted and one for which they are not. All expenses incurred on the common issues qualify for an award." (*Akins v. Enterprise Rent-A-Car Co. of San Francisco* (2000) 79 Cal.App.4th 1127, 1133 see also *Liton Gen. Engineering Contractor, Inc. v. United Pacific Insurance* (1993) 16 Cal.App.4th 577, 588.)

The record supports the trial court's conclusion that Heritage's fraud claims based on WMC's assignment of the promissory note and Monroy's counter claims that Heritage violated the Rosenthal Act and FDCPA were interrelated. The facts and issues related to Heritage's claims and Monroy's counter claims were almost identical, as they both related to the question whether Heritage had a legal right to collect money from Monroy. We agree with the trial court's finding that Heritage's causes of action were closely interrelated with Monroy's counter claims.

We conclude that nothing in the record indicates that the trial judge, who presided over the entire case, abused her discretion in calculating the award of attorney fees.

## DISPOSITION

The judgment and the order awarding attorney fees are affirmed. Heritage is to pay the costs of both appeals.

_____
Lambden, J.

We concur:

_____
Kline, P.J.

_____
Richman, J.

Filed 4/25/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| HERITAGE PACIFIC FINANCIAL, LLC,<br><br>    Plaintiff, Cross-defendant, and<br>    Appellant,<br>v.<br>MARIBEL MONROY,<br><br>    Defendant, Cross-complainant, and<br>    Respondent. | A135274, A136043<br><br>(Contra Costa County<br>Super. Ct. No. C10-01607)<br><br>ORDER CERTIFYING OPINION<br>FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT[ |

THE COURT:

Good cause appearing, the opinion filed herein on March 29, 2013, is certified for publication pursuant to California Rules of Court, rules 8.1120 and 8.1105, and it is therefore ordered that the opinion be published in the official reports.

Date: _____

                                                        Kline, P.J.

1

Trial Court:                                    Contra Costa County Superior Court

Trial Judge:                                    Hon. Judith S. Craddick


Attorneys for Plaintiff and Appellant:          Law Offices of Mokri & Associates
                                                Brad A. Mokri
                                                Jennifer N. Harris

Attorneys for Defendant and Respondent          Law Office of Peter Fredman
                                                Peter B. Fredman




*Heritage Pacific Financial, LLC v. Monroy* (A135274, A136043)